WILL OF MCNAUGHTON: FRAME, Executor, and another, Appellants, vs. PLUMB and another, by guardian *ad litem*, Respondents.

FRAME, Executor, and another, Respondents, vs. PLUMB, by guardian *ad litem*, imp., Appellant.

*November 11, 1908—March 9, 1909.*

(1) *Witnesses: Competency: Transactions with persons since deceased: Officers of corporations.* (2–4) *Constitutional law: Vested rights: Remedies: Change in rules of evidence.* (5) *Appeal: Affirmance: Majority not concurring as to error.* (21) *Rehearing: Inaccuracies.* (6–20) *Trusts: Expenses of litigation, from what funds payable: Guardians* ad litem: *Compensation: Necessary expenditures: Estates of decedents.* (22) *Corporations: Officers: Effect of resignation.*

1. Ch. 197, Laws of 1907, respecting the competency of officers of a corporation to testify, deals with the status when the person is offered as a witness.

2. One cannot acquire a vested right in a judicial remedy unless it is of the contract so that an invasion of the remedy necessarily impairs the property right.

3. The exception noted does not apply to a mere rule of evidence which leaves other rules, ample to establish the remedial right by competent witnesses.

4. It is competent for the legislature to prescribe a rule of evidence as by ch. 197, Laws of 1907, applicable to transactions which happened prior to the enactment, but incompetency of a witness resulting may be avoided by removal of the condition upon which it is based before the person affected is offered as a witness.

5. On appeal from a judgment, unless there is a concurrence of a' majority of the participating justices in support of at least one material ground of error, the judgment must be affirmed of necessity.

6. Generally speaking, it is improper for a court to adjudge or order paid out of trust funds the expenses of litigation of a defeated party respecting such fund except to the extent of his interest in the fund.

7. In general, representatives of owners of a trust fund have no authority to stipulate away the subject of the trust in payment of costs and expenses of litigation respecting the fund, and any such stipulation should not be recognized by the court as a basis for an order or judgment.

8. Without plain legislative authority a trust fund should not, in any case, be depleted to pay the expenses of litigation in respect thereto of a person who has no interest therein.

9. The legislature may make reasonable regulations for compensating out of a trust fund a representative, such as a guardian *ad litem* of an infant, required to be made a party to litigation, for his services and necessary expenditures, regardless of whether the infant has any interest in such fund.

10. In judicial proceedings to settle an estate, infant parties must be represented by guardians *ad litem*, regardless of any statute; moreover, the court rules require it.

11. A proceeding to settle the estate of a deceased person is in the nature of an action *in rem*, and all parties interested in order to be bound are required to be made parties.

12. In such proceedings adult persons are interested in having infant parties properly represented, as without that such adults could not safely possess themselves of the fund whether it belonged to them or not, hence the basis for depleting the fund to pay the expenses of such representatives regardless of whether the wards have any interest in the fund.

13. Compensation for services of a judicial assistant, such as a guardian *ad litem*, in the conservation of a trust fund, should be limited to the reasonable value of somewhat similar services in official life.

14. The rules before stated having been well established prior to the enactment of ch. 267, Laws of 1907, it is presumed the legislature intended the measure of compensation to be the one established by judicial policy.

15. The law referred to leaves the court broad discretion as to whether to allow compensation or not and the amount gauged by the judicial rule.

16. The provision to the effect that the allowance must be fixed by the court in which the litigation is had is a limitation of authority.

17. A judgment against the ward for costs is not a liability of the guardian *ad litem*. Payment thereof by him is not, under ordinary circumstances, to be recognized as a necessary expenditure of his.

18. The words "payment can be directed by the court" limit the right of direction to property *in custodia legis*, leaving the balance, if any, allowed, collectible out of the property of the ward as his debt.

19. The allowance is not required to be taxed after the manner of taxing costs. It may be fixed in any way within judicial discretion.

Will of McNaughton: Frame v. Plumb, 138 Wis. 179.

20. In a proceeding to fix the allowance of a guardian *ad litem* he does not represent the ward. Whether in such cases the ward should be represented or left wholly to be protected by the court without assistance, not decided.

[Syllabus by MARSHALL, J.]

*On motion for rehearing:*

21. Inaccuracy in statements of fact in an opinion by this court is not ground for a rehearing where it did not affect the result.

22. Even where the charter of a corporation provides that its officers shall hold until their successors are elected and qualified, or appointed and qualified, the resignation of an officer without any acceptance thereof vacates the office for all general purposes unless acceptance is specially required by the charter.

APPEALS from a judgment of the circuit court for Waukesha county: MARTIN L. LUECK, Circuit Judge. *Modified and affirmed.*

Cross-appeals from a judgment of the circuit court on appeal from the county court of said county admitting to probate an instrument purporting to be the last will and testament of Elizabeth McNaughton.

Proceedings to establish the will were instituted in such county court October 2, 1906. Therein *Ina Jane Plumb* and *John Clyde Plumb,* minors and the heirs at law of the deceased, represented by their guardian *ad litem, D. S. Tullar,* an attorney at law, contested the will upon the ground that the testatrix at the time of its execution was not of testamentary capacity and that it was procured by fraud and undue influence exercised by the representatives of the principal beneficiary. The proceedings in the county court were brief, resulting in the will being allowed. An appeal was seasonably taken to the circuit court for Waukesha county. The guardian *ad litem,* with the approval of the circuit court, employed Ernst Merton, a duly qualified attorney at law, to assist as counsel. Such court May 11, 1907, directed the special administrator, no executor having been yet appointed, to pay out of the estate $300 to enable the guardian *ad litem* to obtain the attendance of witnesses upon the trial. The pro-

ponent and person named as executor appealed to this court and prevailed upon the ground that there was no law authorizing the direction.

The trial occupied some eight days, thirty-eight witnesses being sworn. It resulted in favor of the proponent.

The will was executed June 13, 1904, at the residence of the testatrix, she signing the same with her own hand and it being witnessed by Ray Briggs and Margaret McNaughton, the latter being a distant relative and a member of the family of John D. McNaughton, in a part of whose residence the testatrix had made her home for many years. She, after making a few small bequests, among them $2,000 to John D. McNaughton, expressed as for fifteen years' services and board and $100 additional for each year she might live after the date of the will, and $100 to each of the grandchildren, willed the residue of her estate, which proved to be somewhere around $35,000, to the trustees of *Carroll College,* a denominational school of the United Presbyterian Brethren, a church society with which the one she belonged to affiliated. She died about two years and two months after the will was made.

There was considerable conflicting evidence as to the testamentary capacity of the testatrix at the date of the will. The opinion evidence, of which there was much on the part of the contestants, was from nonexperts, based upon their observation of the testatrix for a considerable length of time before the will was made. The general nature of contestant's opinion evidence is fairly indicated by that of Mrs. Vanderpool. On direct examination she said in substance this: I lived on the place formerly belonging to the McNaughton family, of which deceased was a member. She lived there many years ago. I knew her for some thirty-five years before she died. and was accustomed to see her frequently in the later years of her life. I visited her in 1892 when she was sick. Her mind was then not just right. She seemed to see objects in

a false aspect. After that I met and conversed with her. She would feel of my dress as if it was new to her and inquire if it was new when in fact she had seen it many times. She visited me at the old place and went about the yard apparently delighted to be there. She inquired about the condition of things existing when she resided on the farm, such as a flower bed and a fence around the garden, without seeming to appreciate how long a time had elapsed since she went away. She visited the place again in 1905 and was then unable to carry on a conversation. She was very forgetful and would reiterate some simple incident over and over again, unmindful of the fact that she had before related it. In my opinion she was not at the date of the will of sufficient mental capacity to comprehend perfectly the condition of her property, her relations with the persons worthy to be the objects of her bounty, and the meaning of the paper she signed for a will. On cross-examination the witness said, in 1905 Elizabeth realized that she was forgetful and spoke of herself disparagingly on that account. In 1903, while she recollected the condition of things on the farm as they existed thirty-five years before, she would forget matters of very recent occurrence. She was never reputed to be much of a talker. I never talked with her about business.

A part of the opposing evidence was by Dr. Kempster, an expert on mental diseases, who testified to this effect: The paralysis which afflicted the testatrix some over two years before she made the will was not such an affliction as to affect the mind after her physical recovery. Mere forgetfulness in old age, called senility, is loss of brain function; not inconsistent with comprehension of property interests and pecuniary obligations. Such mere senility is not the brain disease sometimes afflicting aged persons and called senile dementia. A person from mere senility might forget some things, such as the names of friends and children, but would not be likely to forget to collect moneys due as principal of loans or interest

thereon. Advanced senility would be indicated by failure to collect interest for fourteen or fifteen years, but the habit of taking certificates of deposit for money received from time to time and placing them in a safe lock box and keeping them there, and declarations of the party that she would not loan any more on mortgages because she did not want to be bothered with such matters nor collect interest upon certificates of deposit because of not understanding it and not wanting to be bothered, at the same time as money came in from loans depositing the same in the bank and taking certificates of deposit and preserving them as aforesaid, would indicate good capacity to take care of property. The evidence of the doctor related to circumstances established by the evidence or in respect to which there was evidence warranting a finding of their existence. There was evidence that the testatrix had allowed accrued interest on her certificates of deposit to remain uncollected for many years and that there was the same habit during her sister's lifetime, when she, acknowledged to be of good business capacity, attended to such matters for both. There was also evidence to the effect that Elizabeth at times indicated by what she said that she did not comprehend the amount of her property or did not wish to have others know of her circumstances.

She was eighty-two years of age at the time of her death. She was a maiden lady, and for many years prior to 1889 resided on a small farm with Jane Ann, her sister, also a maiden lady, the property interests of the two, as before indicated, being looked after in the main by the latter. Both of the sisters during their declining years showed a strong inclination to devote their property, in the main, to charitable purposes. In 1889 they went to live at the home of John D. McNaughton, where the testatrix died. About a year after such residence commenced Jane Ann died. From that time up to substantially Elizabeth's death, she, with some assistance, looked after her property, which was mainly in the form

of securities, some being secured by mortgages on real estate
and some being in certificates of deposit in the Waukesha
National Bank, of which *Andrew J. Frame,* a trustee and the
treasurer of *Carroll College* and the person who drew the
will, was largely the owner and was the president.   She had
a safe lock box in the bank where she kept her papers and un-
invested money, no one having access to the box but herself.
She had a stroke of paralysis some over two years before the
will was made, from which she never wholly recovered.   It
weakened her mentally and physically and was somewhat
progressive from the time it occurred until she died.   *Car-
roll College,* located at Waukesha, Wisconsin, was an incor-
porated institution having a board of trustees required by the
organic law of the institution to be elected for specific terms,
those in office to hold until their successors were elected and
qualified.   It has a president, secretary, and treasurer.
*Andrew J. Frame* for many years before the will was made
had been one of the trustees of the college and its treasurer.
He was a person in whom the testatrix placed unbounded
confidence as regards such business matters as she was accus-
tomed to do with the bank.   Dr. Carrier was the president
of the college, whose duty it was, among other things, to se-
cure such beneficences to the institution as he reasonably
could.   In a conversation with *Mr. Frame* he learned of the
existence and circumstances of Elizabeth.   Shortly there-
after, accompanied by W. L. Rankin, another trustee of the
college, he visited her for the purpose of obtaining pecuniary
favors to the institution.   Before meeting her the two visitors
were informed by the McNaughtons, who knew the purpose
of the visit, that Elizabeth was growing childish.   They im-
portuned her for a contribution to the institution, but not
being successful, agreeable to her views they promised to have
*Mr. Frame* see her and talk the matter over.   Later Dr. Car-
rier wrote Elizabeth a letter in which he informed her he had
explained matters to *Frame* and made suggestions calculated

to influence her in favor of the college upon religious grounds. Some two months thereafter Dr. Carrier and *Mr. Frame* visited Elizabeth. Prior thereto and after *Mr. Frame* was informed by Dr. Carrier that Elizabeth wanted to see him, he was informed by a second messenger from her to the same effect. Upon this second visit Carrier met her first and suggested that she make a will in favor of the college. She then said she had been thinking of giving the college $200. He suggested that she wait and talk the matter over with *Frame* and then left the two together to discuss the matter. According to *Mr. Frame's* story she told him what Dr. Carrier wanted and expressed what her preferences were, saying that she desired to make another will and to give John D. Mc-Naughton $2,000, and otherwise stating her wishes, which were later embodied by *Mr. Frame* in the instrument which she executed as her will. After she made her wishes fully known to *Mr. Frame,* she handed him $100 to deposit in the bank on certificate of deposit and took his receipt to hold until she visited the bank and obtained the certificate. On the return trip *Mr. Frame* informed Dr. Carrier the result of the visit. Shortly after this occurrence *Mr. Frame* again visited Elizabeth with the instrument ready for execution. She then suggested some changes which were interlined in the typewritten draft. There was evidence tending to show that the witnesses signed the paper in her presence and in the presence of each other, and that she subscribed her name thereto in their presence. *Mr. Frame,* by Elizabeth's direction, took the will when he returned to Waukesha, the understanding being that she would soon visit the bank and take her old will from her safety deposit box and destroy it and place the new will therein. That understanding was carried out. The old will was taken by Elizabeth from the box and *Mr. Frame* destroyed it in her presence and at her request. At the same time she made a deposit of $40 in the bank, treating the same as usual. From that time she occa-

sionally visited the bank up to near the time of her death. There was evidence tending to show that during the two years and two months intervening between the making of the will and Elizabeth's death she did considerable business and conferred favors upon some persons whom she thought worthy thereof, and that she did the business relying more or less upon assistance by others as she had before making the will. There was evidence which, taken by itself, strongly suggested that she was a weak-minded person, incapable, unaided, to do business and not comprehending the magnitude of her property or the proper manner of taking care of the same. There was other evidence tending to prove a contrary condition.

There was further evidence to the effect that in the will destroyed as aforesaid, which was made in 1892, she made the same provision for the contestants as in the later will, and after making some small gifts, including one to *Carroll College,* the residue of the estate was given to several boards of the Presbyterian Church and *Mr. Frame* was named as executor. The sole proof of what occurred between Elizabeth and *Mr. Frame* was given by himself. It was to the effect that she acted upon her own judgment throughout. All his evidence in that regard was objected to under sec. 4069, Stats. (1898), as amended by ch. 197, Laws of 1907. The objection was overruled upon its appearing that he had resigned his position as trustee and treasurer of the corporation in order to qualify himself to testify. The court in reaching a conclusion depended largely on *Frame's* evidence, holding that in the absence thereof such conclusion could not be reached.

The decision was to the following effect: At the time the will was made Elizabeth was fully capable of making a testamentary disposition of her property and did so of her own free will. She was not unduly influenced by *Mr. Frame* and Dr. Carrier, or either of them. The will was executed in all respects according to law and is entitled to probate. The

guardian *ad litem* of the infant contestants is entitled to be paid out of the estate $454.45 as disbursements and $3,000 for services in the litigation. Judgment was rendered accordingly.

For the executor and the residuary legatee there were briefs by *Frame & Blackstone,* attorneys for the executor, and *Quarles, Spence & Quarles,* attorneys for *Carroll College;* and the cause was argued orally by *H. J. Frame* and *T. W. Spence.*

*D. S. Tullar,* guardian *ad litem,* and *Ernst Merton,* of counsel, for the minor contestants.

The following opinion was filed December 15, 1908:

MARSHALL, J.   As indicated in the statement, *Mr. Frame* was not an officer of the college when he testified.   So he was a competent witness respecting what occurred between himself and the testatrix, as regards the disability of corporate officers to testify under ch. 197, Laws of 1907.

The statute deals with the condition when a witness is offered.   Though *Mr. Frame* was competent respecting the transaction he testified to till after the commencement of the litigation, it did not prevent him being rendered incompetent before the trial by a statute passed in the meantime, but he could thereafter restore his competency by surrendering that which interfered therewith, as he did.   One cannot acquire a vested right in a judicial remedy unless it is of the contract so that the invasion of the remedial element necessarily impairs the contract (*Second Ward Sav. Bank v. Schranck,* 97 Wis. 250, 73 N. W. 31; *Peninsular L. & C. Works v. Union O. & P. Co.* 100 Wis. 488, 76 N. W. 359; *Eau Claire Nat. Bank v. Macauley,* 101 Wis. 304, 77 N. W. 176), or otherwise divest vested rights (*Rich v. Flanders,* 39 N. H. 304).

The first two cited cases are within the first exception.   So it was held that a law injuriously affecting the remedial element affected the value of the principal thing, contrary to the

inhibition of the national constitution (sec. 10, art. I) as to any state passing a law impairing the obligation of contracts. That is distinguishable from a mere change in rules of evidence, not necessarily affecting any property right, although rendering a right more difficult of establishment, or incapable of being established at all because of the parties being without competent evidence, there, however, being left ample rules by which such right could be established if competent witnesses were at hand. *Besson v. Cox,* 35 N. J. Eq. 87; *Karney v. Paisley,* 13 Iowa, 89; *Westerman v. Westerman,* 25 Ohio St. 500; *Rich v. Flanders, supra; Southwick v. Southwick,* 49 N. Y. 510; *Talladega Ins. Co. v. Landers,* 43 Ala. 115; *Calderwood v. Calderwood's Estate,* 38 Vt. 171; *Wood v. Kaufman,* 135 Mich. 5, 97 N. W. 47; *Clark v. Harper,* 215 Ill. 24, 74 N. E. 61; *Mitchell v. Haggenmeyer,* 51 Cal. 108; *Kenney Presbyterian Home v. Kenney,* 45 Wash. 106, 88 Pac. 108; *Crawford v. Halsted,* 20 Grat. 211.

The plain applicability of the citations is indicated by the following:

"The statute does not relate to or impair contractual rights or vested property rights, but it relates to the remedy and declares a rule of evidence. There appears to be no vested right in any mere rule of evidence." *Kenney Presbyterian Home v. Kenney, supra.*

Rules of evidence "are at all times subject to the modification and control of the legislature . . . and the changes which are enacted may be made applicable to existing causes of action, even . . . where retroactive laws are forbidden." *Crawford v. Halsted, supra.*

In relation to a law affecting qualification of a witness which was passed pending the suit, "it is enough that the witness is competent when offered." *Talladega Ins. Co. v. Landers, supra.*

A statute may change mere rules of evidence, and although it applies to cases in which the cause of action accrued and

the rights became vested prior to its passage, it is constitutional, though a statute affecting rules of evidence, and in fact divesting vested rights, would be unconstitutional. *Rich v. Flanders, supra.*

We now pass to the dominant subject on contestants' appeal, it being understood that we give such weight to *Frame's* evidence as we severally consider it is entitled to, regarding it as having been properly received.

With due regard, it is thought, for the conclusions of the trial judge on questions of fact, we have reached here conflicting results. The most careful consideration, which it seems could be well given to the matter by each, has not enabled a majority to arrive at harmony respecting the two principal assignments of error, as to facts, presented for consideration. The Chief Justice, Justice Dodge, and the writer are not able to see that clear preponderance of evidence against the trial court's conclusion on either the subject of testamentary capacity of the deceased at the time the alleged will was made or that of undue influence in producing the will, justifying a disturbance of the findings complained of. Justices Kerwin and Timlin are able to see such clear preponderance on both questions. Justice Siebecker agrees with them on the last but not the first, while Justice Barnes agrees with them on the first but not the last. A situation so extraordinary rarely occurs in judicial work. That it should move judicial minds to exhaust all reasonable efforts for harmony, as it has in this case, is most natural. The situation, while peculiar in a high degree, is nevertheless not new, as the following citations will show: *Legal Tender Cases,* 52 Pa. St. 9, 101; *Browning v. State,* 33 Miss. 47, 87, 88; *Cook v. Drew,* 3 Stew. & P. 392; *Bell v. Morrison,* 27 Miss. 68. The rule adopted in the most pronounced of those cases and highly commended as sound in *Lipscomb v. State,* 75 Miss. 559, 624, 23 South. 210, 230, seems to be the only logical one, though one case found in the books (*Smith v. U. S.*

.5 Pet. 292, 303) proclaims a different doctrine, but without assigning any reason therefor or its having been subsequently followed by the federal court, so far as we can discover. The view which we adopt is that a majority must agree on some one specific ground of error fatal to the judgment or it must be affirmed. Otherwise there would be a reversal without any guide for the trial court upon a new hearing. Unless the trial judge changed his mind, the result would be the same as before and a like result as formerly would happen on a second appeal, and, as said by HANDY, J., in his opinion in *Browning v. State, supra,* and highly commended, as before indicated, in *Lipscomb v. State, supra,* "such would be the strange and anomalous attitude of the case, *ad infinitum,* as often as it should be tried below and brought here on the same state of facts."

The foregoing does not leave anything which need be said on contestants' appeal.

We have left to consider the objection raised by proponents to the allowance of $3,000 as compensation for the guardian *ad litem* and $454.54 for his disbursements, all to be charged against the body of the estate, except $200. If authority to make such allowance at all exists it is by virtue of ch. 267, Laws of 1907. Generally speaking, it must be conceded that no inherent power exists in courts to take the property of one person and devote it to the benefit of another, and that the legislature cannot, legitimately, authorize such proceeding, as by taking the property of the successful party in litigation to pay the expenses incurred by his adversary in the controversy.

This court, in harmony with general authority, has said with reference to judicial dealing with a trust fund, that no part thereof belonging to one should be used to defray the expenses of another; that in case of compensating a guardian *ad litem* in addition to taxable costs, it should be done out of the infant's property under the control of the court. *Tyson*

*v. Richardson,* 103 Wis. 397, 401, 79 N. W. 439; *Stephenson v. Norris,* 128 Wis. 242, 263, 264, 107 N. W. 343.   The court has condemned in unmeasured terms the practice, which obtained at one time, of treating a trust fund under judicial control as open to be depleted by judicial direction to compensate persons for their expenditures in litigation in respect thereto in hostility to the real owners.   *In re Donges's Estate,* 103 Wis. 497, 79 N. W. 786; *Fox v. Martin,* 108 Wis. 99, 102, 84 N. W. 23; *Becker v. Chester,* 115 Wis. 90, 91 N. W. 87, 650; *Stephenson v. Norris,* 128 Wis. 242, 263, 107 N. W. 343.   Such use of property has been characterized as wholly without justification in the absence of legislative authority and as "trenching closely upon that forbidden act of depriving one of his property without due process of law or taking property from one for the private benefit of another." *In re Donges's Estate,* 103 Wis. 497, 516, 79 N. W. 786.

So plainly does such interference with a trust fund, without some valid written law authorizing it, shock the sense of justice, that this court has felt called upon to refuse to give effect to stipulations of attorneys for all parties to the litigation to the contrary in case of the parties being minors (*Fox v. Martin, supra*), and applied the same rule as to power of trustees, generally, to stipulate away part of the subject of the trust and obtain judicial approval thereof (*Becker v. Chester,* 115 Wis. 90, 147, 91 N. W. 87, 650).   So, as will be seen, about the last, so far as of judicial creation, of a bad practice has been swept away; a practice which, probably, as suggested in *In re Donges's Estate, supra,* became engrafted upon our jurisprudence through consent of counsel in individual cases till it came to have the appearance of judicial sanction as a rule of justice, overlooking the plain wrong of taking the property of one without his consent for the benefit of another, as if the mere circumstance of that property being temporarily *in custodia legis* gave a judicial trustee greater power in that regard than any other, while in fact, from a

moral standpoint, it should render the property safely removed from such danger. Not a vestige of the infraction which once received approval is left in, our system, with the narrow exception noted in *In re Donges's Estate, supra,* which seemed to have some basis in reason and to be so firmly entrenched by a long line of decisions as not to appear properly removable without legislative assistance, other than the element restored by legislative interference under the law before referred to, upon which the contestants rely, and a prior law (ch. 397, Laws of 1901), both of which were designed, as appears, to avoid the result of *In re Donges's Estate, supra,* keeping within the reason thereof as to the legitimate basis for diversion of trust property.

We do not abate at all condemnation of the practice, so far as it is dependent upon judicial policy alone, expressed in *Becker v. Chester, supra,* pp. 147, 148, 91 N. W. 651:

"The whole practice of inviting litigation by allowing parties to indulge in judicial controversies involving trust funds at the expense thereof, regardless of whether such parties win or lose, is pernicious and should not be encouraged by any judicial rules. A careful reading of the *Donges Case* must convince any one that such was the view of this court when that case was decided. That view has rather been strengthened than weakened by efforts to have the rule declared by the court liberally construed, minimizing its effects as regards the injustice it was intended to prevent. All such efforts must fail. We incline to a strict rather than a liberal construction of the rule."

The court declines to be responsible for any practice which would tend to invite litigation and render property testamentarily disposed of a probable prey of those who have no interest therein or those who unjustly seek to enhance their interest.

In the face of judicial policy thus clearly and repeatedly declared, the law in question was passed. With its mere legislative wisdom; that which is within the field of legislative

supremacy, we have nothing to do. So far as it does not transcend constitutional limitations, it must be unhesitatingly administered. So far as experience by such administration shall show that it was unwise, the same power that enacted it will, doubtless, remedy the mischief. In any event, there rests the responsibility, as does the *responsibility* for things which courts at times are criticised for by the inconsiderate, who cannot, or do not, discriminate between power to make law and power to declare and administer it.

The theory of the statute is, and correctly too, that a proceeding to administer an estate is in the nature of one *in rem,* the *res* being for the time being *in custodia legis.* Woerner, Am. Law of Adm'n, *500, *501. It requires the presence, actually or by representation, of all parties interested or who may be interested whether *in esse* or not. Those who by reason of infancy cannot appear for themselves must be represented by guardians *ad litem* in order to be bound, whether there is any statutory requirement in that regard or not. *O'Dell v. Rogers,* 44 Wis. 136. It is the duty of the court to see that its wards are represented regardless of any written law. Moreover, the court rules impliedly make provision therefor. Stats. (Supp. 1906), p. 1120. It is the duty of parties interested to call the court's attention to the necessity therefor and they are vitally interested in the duty being performed. The guardian *ad litem* must be an officer of the court, an attorney duly admitted to practice and competent to protect the rights of the minors, and competent to respond in damages for negligence or misconduct in the discharge of his duties as an assistant in the administration of justice. Circuit Court Rule IX; *Tyson v. Richardson,* 103 Wis. 397, 399, 79 N. W. 439. The position of guardian *ad litem* is an important one. The obligation to accept the trust and to faithfully discharge the duty regardless of compensation is an incident of the profession of law and the lawyer's official station. It is for the court to see that such duty is performed.

So while there is the judicial function of exacting the strict-est fidelity on the part of the appointee and encouraging him to that end in every practicable way, there is the correlative duty to see that the faithful servant and officer does not go without a reasonable pecuniary reward for his labor so far as there is property of the ward under the control of the court, or otherwise, out of which it can be paid by direction of the court (*Tyson v. Richardson, supra*), or the ward's debt, as in fact it is (*Smith v. Smith,* 69 Ill. 308, 312; *Walton v. Yore,* 58 Mo. App. 562), can be collected, or there is a fund under the control of the court which, or a party before it who, should equitably bear the burden, under established rules or written law on the subject.

It will be thus seen that guardians *ad litem* are as essential to parties interested adversely to the infant as to the latter, since only by use thereof could they succeed, safely, if at all, to the subject of the proceedings. So it has been held that compensation to the guardian *ad litem* on some basis,—even if it turns out that the infant has no interest in the subject matter,—payable primarily out of the infant's property, if he has any, whether presently under control of the court or not, otherwise out of the fund conservable only by his presence, or by the parties, requiring for their own interest that the in-fant be called into the litigation, such basis not permitting any onerous burden and in some jurisdictions being so confined as to assimilate to taxable costs and called such. *Weed v. Paine,* 31 Hun, 10; *Yourie v. Nelson,* 1 Tenn. Ch. 614; *Car-ter v. Montgomery,* 2 Tenn. Ch. 455; *Union Ins. Co. v. Van Rensselaer,* 4 Paige, 85, 87; *Gott v. Cook,* 7 Paige, 521, 544; *Att'y Gen. v. North Am. L. Ins. Co.* 91 N. Y. 57; *Ker-baugh v. Vance,* 5 Lea, 113; *Holloway v. McIlhenny Co.* 77 Tex. 657, 662, 14 S. W. 240; *Walton v. Yore,* 58 Mo. App. 562; *Walker v. Hallett,* 1 Ala. 379; 2 Hoff. Ch. Pr. 74.

These and many other authorities that might be referred to are to the effect that under no circumstances should com-

pensation be allowed to an unsuccessful guardian *ad litem,* payable out of a fund under control of the court, in excess of taxable costs, or a sum in the nature thereof, as taxed between party and party, in the absence of special legislative author ity. All recognize the right of the legislature to reasonably pursue such a fund in such a case. The great weight of authority goes to the full length of our adjudications that, without legislative authorization, no compensation whatever can be allowed to an unsuccessful guardian *ad litem* standing for an infant contestant of a will, or any party, similarly situated, payable out of the general fund or any part of it not belonging to the infant. *Wallon v. Yore, supra; Jones v. Yore,* 142 Mo. 38, 47, 43 S. W. 384; *Matter of Robinson,* 40 App. Div. 30, 57 N. Y. Supp. 523; *Downing v. Marshall,* 37 N. Y. 380; *Will of Budlong,* 100 N. Y. 203, 3 N. E. 334; *Matter of Holden,* 126 N. Y. 589, 27 N. E. 1063; *Matter of Robinson,* 160 N. Y. 448, 55 N. E. 4.

The foregoing somewhat lengthy treatment of the general subject, though largely historical, is helpful in that it indicates clearly the basis for such legislation as that in question, viz.: that it relates to dealing with the subject matter in the nature of an action *in rem,* all parties interested in the *res* being served by all others being brought in so as to be bound, who have, presently or contingently, or may claim to have any interest therein. That does away, manifestly, with all constitutional objections as regards reasonable compensation to the necessary judicial aids to that end, such as guardians *ad litem.* The treatment of the subject also shows that a very narrow limitation of reasonable compensation in a case of this sort, where it is chargeable to and collectible out of a fund *in custodia legis,* on principle, is not new. There are statutes in some other states on the subject, notably in New York, California, Kentucky, Iowa, and Texas, making some provision for compensation in such circumstances. But in such cases the power is, directly or indirectly, carefully fenced

about so as to prevent abuse. Where the common law prevails abroad and in the states, with but few exceptions, the time-honored rule is left in full force, that the court may command the service of any member of its bar when it needs an instrument of the sort to stand for the helpless, and that the service, aside from the capacity of the infant to pay, must go unrequited except by the privilege enjoyed as a member of the profession and the distinction of having well performed the duty assumed *cum onere*. *Stephenson v. Norris,* 128 Wis. 242, 264, 107 N. W. 343; *Richardson v. Tyson,* 110 Wis. 572, 579, 86 N. W. 250; *House v. Whitis,* 5 Baxt. (64 Tenn.) 690; *Wright v. State,* 3 Heisk. (50 Tenn.) 256.

It may be safely said to the honor of the profession that the interests of judicial wards have been as faithfully conserved from time immemorial by the discharge of that duty, gratuitously in many cases, as probably it will be under a system securing therefor a more certain money value, but it is recognized that the legislature may relieve the profession of that burden with its correlative honors if it sees fit.

The statute provides that in a case of this sort the guardian *ad litem* "may be allowed compensation for his services and for his necessary expenditures in the litigation, *to be fixed by the court,* in which such proceedings or litigation is had, and be paid out of the body of the estate or property in controversy, if the infant has no available property out of which such payment can be directed by the court." The term "fixed by the court, in which such proceedings or litigation is had," is unambiguous. Doubtless whatever original authority in the matter existed as to this case was lodged in the court rendering the judgment complained of as regards *the litigation in that court.* No basis for compensation is suggested in the law. Not even the word "reasonable" is used, as in every similar statute, so far as we can discover. A very broad discretion, however, may be read out of the language as to whether an allowance shall be made or not and to what ex-

tent, from the words "may allow," etc., while it might be argued that "may" should be construed as must. Facing the matter the legislature had to deal with in the light of the mischiefs thereof as we have detailed them, the former view would seem to be the correct one. We adopt it both as regards power to determine whether compensation shall be allowed or not and the amount thereof. That discretion the legislature necessarily contemplated would be a sound legal discretion; that it would be guided by the general judicial conception here of the measure of such services when compensation by common-law rule is permissible; and that the circumstances as to whether the compensation would come out of property belonging to the infant and whether he has any interest in the subject conserved and many other things would be given their legitimate common-sense bearing. It is quite manifest that a basis of compensation, as in ordinary cases between party and client, was not thought of. That would be contrary to the standard in that regard for guardians *ad litem* in general and particularly in this state. The rule was firmly established here long before the law was passed that the basis should be that ordinarily paid to compensate for official services of a somewhat similar character. *Richardson v. Tyson,* 110 Wis. 572, 579, 86 N. W. 250; *Speiser v. Merchants' Exch. Bank,* 110 Wis. 506, 513, 86 N. W. 243; *Harrigan v. Gilchrist,* 121 Wis. 127, 99 N. W. 909.

In the cases cited it was said that judicial officers perform their public duties "for pecuniary rewards wholly incommensurate to what the same industry, learning, and ability would have commanded at the hands of clients." It is upon such basis "rather than with private contract that compensation should be made in measuring the allowance to" a guardian *ad litem. Richardson v. Tyson, supra.* Later the growing and pernicious practice of extravagantly exploiting trust funds under judicial control for the enrichment of judicial assistance, such as attorneys for receivers and guardians *ad*

*litem,* was enlarged upon and the rule above stated was reiterated and made as significant as could well be, to the end that courts might set an example of careful, businesslike conservation of trust property; and members of the profession, called to stand for absent and incompetent beneficiaries under the court's appointment or with its approval, might better appreciate that it contemplates performance of duties incident to the high privilege of a member of the court and in part compensated thereby and by its honors; this vigorous language being used by Mr. Justice DODGE:

"Only in the wise discretion and firmness of courts can there be found prevention or remedy for the abuse and disgrace of judicial conservation of estates from their enemies, only to permit their destruction by the very salvers. If such abuses continue, the beneficent power of a court of equity to take to its sheltering arms a litigated estate while rights to it are being established will become a mockery, worse than the avoided perils as it is more effective." 110 Wis. 513, 514, 86 N. W. 246.

It was in face of unwritten law elsewhere, as above, that no compensation to a guardian *ad litem* can be justly allowed in excess of something in the nature of taxable costs chargeable to the prevailing party or payable out of his property, and the unwritten law recognized here, that none whatever should be allowed payable out of the property in which the person represented has no interest, and the general policy of the written law in other jurisdictions, that in case of compensation in the instances where by the unwritten law it is not allowable the same should be quite limited so as to prevent abuse, and the further unwritten law that such compensation, where allowable, should be on the scale of official services, that the law in question was passed, giving the court, as before indicated, discretion to allow compensation or not and limiting the same, by necessary inference, in any event, to what is reasonable under the circumstances. Manifestly the word "reasonable," as here used, is referable to the judicial stand-

ard, so recently and firmly established, and the circumstance which cuts some figure by the unwritten law, of whether the service is in conservation of property belonging' to the party represented or not, is not to be wholly lost sight of.

Testing the propriety of the amount allowed the guardian *ad litem* by the foregoing, it appears at once so entirely out of harmony with the correct standard as not to be measurable at all thereby, showing clearly that it was not in the judicial mind of the court below, hence its decision is not entitled to any weight in now determining what is proper.

The case did not involve any very intricate questions of law nor any of fact as regards methods of proof. The rules to be followed in the litigation were substantially removed from all uncertainties by many decisions of this court. The trial occupied about eight days. There seem to have been many witnesses, easily obtainable, who were not at all adverse to testifying fully in respect to the matter in contestants' favor. Some over thirty witnesses were called who testified, in general, in harmony. Under all the circumstances it seems that ten to twenty days was ample for preparation of the case for trial; all services rendered outside of the trial in circuit court. The property involved consisted of somewhere about $40,000 money value, but the work was neither more nor less because of the magnitude of the estate, though, of course, the responsibility was, by reason of that feature, somewhat enhanced. The guardian *ad litem* was appointed, we must assume, because of his well-known fitness for the position, so he did not need an assistant distinguished attorney, accustomed to charge liberally because of his professional ability, for his services. The court allowed, in the whole, about eight per cent. of the entire fund, and, as appears, allowed a like amount on the other side to be charged to the estate.

With what has been said we may well refer to the following to emphasize our conclusion that the allowance to the guardian *ad litem* was very far too large. With the other

allowance, incidentally referred to, we have nothing now to do.  In *Smith v. Smith,* 69 Ill. 308, there was a property around $40,000 involved, belonging to the infant.  The compensation to the guardian *ad litem* was supposed to be payable out of the infant's property.  The litigation was important and considerable. · It was attended to in the infant's behalf with commendable fidelity and was successful.  Attorneys testified to the reasonable value of the guardian *ad litem's* service, ranging from $1,000 to $10,000.  The trial court allowed $3,500.  On appeal it was held that in the proceedings to fix the compensation of the guardian *ad litem* the latter was in an adversary capacity to the ward, who was therefore unrepresented, and that $1,000 for the service would be liberal, if not large, the court remarking, "Courts have no power to be prodigal with the means of their wards, and whilst they should make just allowances, they are bound to see that their funds are protected."

In *Loftis v. Butler,* 58 S. W. (Tenn. Ch. App.) 886, there was considerable litigation and a trial in two courts.  The guardian *ad litem* was allowed $150—$25 payable out of the general property as costs, and $125 out of the infant's property.  On appeal the allowance was not disturbed, but it was held that in such proceedings the guardian *ad litem* and the ward are adversaries, and the latter should be represented by one competent to protect his interests.  We may well remark, in passing, that there is much support for that holding, without laying down that such representation is ˈnecessary and failure in that regard is jurisdictional error, as is held in some jurisdictions.  At least, want of such representation throws the greater burden upon the court to see that its ward is properly protected.

In *Tyson v. Richardson,* 103 Wis. 397, 79 N. W. 439, there was a large amount of property involved, very much more than in this case.  It belonged, in the main, to persons whose interests were represented by the guardian *ad litem.*  The

questions involved were interesting, complicated, and somewhat new. They required careful study by one possessed of sufficient ability to carefully investigate and analyze precedents and to discover, comprehend, apply, and present most important legal principles. The duty was performed with distinguished ability and success. The service extended through several years, during which there were several trials in the courts of original jurisdiction and several in this court; the guardian *ad litem* meeting in opposition, and successfully, some of the best legal talent in the state. For all such service, on the basis of official work, this court allowed $2,500.

In *Harrigan v. Gilchrist,* 121 Wis. 127, 99 N. W. 909, the services extended over a period of some five years. The claims adjudicated and property involved ran up into the hundreds of thousands of dollars. There was important litigation in many courts in different jurisdictions, some of which was outside of this state. It was attended with almost unprecedented perplexity and was represented by the judicial assistants with commendable fidelity by two distinguished members of the bar. The court allowed as compensation, on the basis of one such attorney, under the rule before indicated, $10,000.

In view of the foregoing we are of the opinion that the compensation of the guardian *ad litem* in this case, including that of his assistant up to and inclusive of the final closing of this litigation, should be limited to $500. The amount allowed by law for an attorney acting under the appointment of the court in the defense of an indigent person charged with a criminal offense is but $15 per day. That exceeds the compensation allowed the highest officer of the state in its legal department, the attorney general, and more than twice that allowed his first assistant.

We do not overlook the suggestion that the allowance of $3,000 to the guardian *ad litem* was by consent of the attorneys for the proponent, and supposed attorneys for the chief

beneficiary under the will, and that the judgment was pre-
pared by such attorneys and entered on their motion.   There
are indications in the record that the court merely adopted
the joint request of the attorneys in the case, $3,000 being al-
lowed to each side.   That was very fair, from one viewpoint,
but, as before indicated, the attorneys had no power whatever
to stipulate away the trust fund, and their attitude in that re-
gard should not have been recognized by the court.

The point is made by proponent's counsel that no allow-
ance should have been made by the circuit court for what oc-
curred here for expenses and services of the guardian *ad litem*
and on account of the judgment for costs rendered against
the infants in this court, because on application here to direct
such allowance it was denied,—and in close connection there-
with the question is suggested, but not urged, as to whether,
under the law, a court has jurisdiction to make any allowance
except on account of litigation therein.

For both of the reasons above mentioned it seems the cir-
cuit court should not have made any allowance except for
what there occurred.   The law is very explicit that the allow-
ance in any instance is "to be fixed by the court in which the
proceedings or litigation is had."   Evidently it was the legis-
lative intention to confine original action in such a matter to
the jurisdiction most liable to be well armed, by personal ob-
servation, to administer the law without the abuses the ju-
dicial rule was designed to prevent.   So the trial court acted
without jurisdiction in making allowance for litigation oc-
curring here; and this court observed the letter of the statute,
and of the application here, in refusing to make a direction
which would have required another court to pass on the al-
lowance for services and disbursements in litigation not had
there, and particularly in refusing to direct payment out of
the estate, of the judgment for costs against the guardian *ad
litem*.

It will be observed that the permissible allowance, outside

of for services, is for "necessary expenditures" of the guardian *ad litem*. That does not include a judgment for costs against a ward. A guardian *ad litem* is not liable for such a debt, and so payment thereof by him is not a necessary expenditure within the meaning of the law, unless it is made by some law a condition precedent to a further step in behalf of the ward, or by reason of some other circumstance out of the ordinary, which is not the case here. It follows that the allowance for necessary expenditures in the court below should have been limited to $343.75, and the elements of costs and disbursements here, amounting to $110.70, should not have been allowed.

We agree with the court below that it was not the legislative purpose that the allowable expenditures should be taxed according to the practice for taxing statutory costs. Nevertheless, competent and definite proof in such a case should be required as to each item and all parties having adverse interests should have notice, and, in a case of this sort, the proponent should make the appropriate counter-proofs, which justice requires. No proof on either side seems to have been made, except the formal affidavit of the guardian *ad litem* to the schedule of disbursements. Explanation might well have been required of some of the charges. The trial court was not bound to allow the bill, even though verified, because not opposed by evidence. However, we cannot say there was a fatal abuse of judicial discretion in disposing of the matter as was done.

Lastly it is contended that the words of the statute,—"paid out of the body of the estate or property in controversy if the infant has no available property out of which such payment can be directed by the court,"—does not restrict the fund to which resort can be had, primarily, to property under control of the court, but includes any property of the ward out of which his indebtedness may be collectible. It may well be that such is the better policy, one more in harmony with the

well-nigh universal rule, both under the written and unwritten law.    However, the legislature seems plainly to have used the term "payment can be directed by the court" with reference to existing conditions produced by judicial effort to limit the previously supposed unjustifiable practice before alluded to, with the intent to supersede such efforts to the extent of restoring the old practice in some particulars.    So viewing the law,—however much it may appear that, as an original matter, a fund in court in which a person is not interested should not be depleted to compensate for efforts in his behalf to obtain it, or some part of it, notwithstanding it cannot be distributed to the real owner without his presence, so long as he possesses property available for the payment of his debt,—we cannot change nor nullify it so long as it is constitutional, as we are of the opinion, as before indicated, it is.

The action in refusing to direct the court below on the motion before referred to, does not preclude now allowing the guardian *ad litem* such compensation as he should have for services and necessary expenditures in this court.    It is a proper matter to consider in this disposition of the case, and we are disposed to make a proper award without further application, and thus speed a final termination of the litigation.

As before indicated, it is the opinion of the court that $500 is all that should be allowed for services from the time the litigation commenced in the circuit court till it shall have been terminated by the entry of the proper judgment under this court's mandate.    The $500 must cover the pecuniary reward for services in both courts.    The expenditures upon the former appeal, according to the presentment in the court below, were $24, exclusive of the judgment for costs, which is not to be counted.    That and the disbursements on this appeal, as taxed by the clerk, under the ordinary rule for taxing costs, except that the taxation must include the personal expenses of counsel in coming here and attending upon the hearing of the appeal, should be allowed.    Such amount should

not be taxed as costs, but as expenditures under the law in question, taxed by direction of the court. The particular manner of arriving at the amount is adopted as just and a convenient one to speedily end the matter, and not, necessarily, as a binding precedent to govern future matters of the kind.

*By the Court.*—On the contestants' appeal the judgment is affirmed *ex necessitate*. On proponent's appeal the judgment is corrected so as to be for $500 for services in the circuit court and this court, and $143.75 for necessary expenditures for litigation in the circuit court over and above the $200 deducted from the total in the court below, and $24 for such expenditures on the first appeal in this court, and such further sum as may be taxed by the clerk under the court's direction, as indicated in the opinion, the whole to be paid out of the body of the estate; and, as so modified and perfected, the judgment on proponent's appeal is affirmed. Costs are to be taxed in favor of the proponent as the prevailing party on both appeals.

The following opinion was filed March 9, 1909:

MARSHALL, J. A motion for a reargument on the part of the contestants, duly submitted, has received attention, resulting in the following conclusions:

Counsel refer, at length, to the use of the words "The United Presbyterian Brethren," page 2 of the statement (*ante,* p. 182), when strict accuracy required, in place thereof, the words "Presbyterian Church" or the "Presbyterian Church of the United States of America." That does not bear upon the result to the amount of a feather's weight.

Counsel again refer to page 4 of the statement (*ante,* p. 184), where notice is taken of the fact that Elizabeth allowed interest to go uncollected for many years, this language being used: "There was the same habit during her sister's

lifetime" when she attended to the business. Counsel say that is wrong, as the evidence shows that one year before Elizabeth's death all interest was collected and the same credited, and there is no evidence to show there was then a habit of allowing interest to run uncollected for from fourteen to seventeen years, as was done after Jane Ann died. Let us see. In the first place, the words of the statement, if wrong as claimed, would not affect the result in any event. In the second place, they do not suggest that Jane Ann was in the habit of allowing interest to go uncollected fourteen to seventeen years, but, merely, that it was the habit during her lifetime, as it was afterward, for interest to go uncollected for years. Now to the record on that. It shows, page 94 of the printed case, that in 1889 the interest was figured up on all Elizabeth's certificates and a statement was made thereof, amounting to $2,617.80; that Elizabeth handed in the certificates to have the interest figured up and that a new certificate for the amount of such interest was issued, which certificate and statement were found among her papers after she died. By reference to the statement, pages 111 and 112 of the printed case, we find that thirty-eight certificates were listed and that interest was back for many years on all of them, the longest time being from December 5, 1873, or nearly sixteen years, and the shortest from August 3, 1883, about five and one-half years, the average being somewhere around eleven years. That seems to bear out what is said in our statement.

Counsel further call attention to page 9 of the opinion (*ante,* p. 188), where it is said, "*Frame* was not an officer of the corporation when he testified," and argue that it is inconsistent with the following words, on page 5 of the statement (*ante,* p. 185), as to the organic law of the corporation: "Those in office to hold till their successors are elected and qualified," in view of the testimony of Carrier that at the time *Frame* testified no one had been elected and had quali-

fied to fill his place.    Counsel make such argument upon the
theory that an officer in a corporation, where the organic law
provides that his term of office shall continue till his successor
is elected and qualified, remains an officer till such time not-
withstanding his resignation.    That is not the law.    On the
contrary, it is to the effect stated in the opinion, *i. e.* even in
case the corporate charter provides that the officer shall hold
till his successor is elected and qualified or appointed and
qualified, he, nevertheless, by resignation, without any ac-
ceptance, unless acceptance is specially required by such char-
ter, vacates the office for all general purposes.    7 Thomp.
Comm. on Corp. § 8460; *Fearing v. Glenn,* 73 Fed. 116.

Counsel seem to think that *Browning v. State,* 33 Miss. 47,
was misapplied.    Quite plainly it is the counsel, not this
court, that misunderstand the case.    It differs only from the
dissenting opinion in the case and with others we cited, no-
tably *Shollenberger v. Brinton,* 52 Pa. St. 10, as to what
should be considered a ground of error upon which there must
be a concurrence of a majority of the judges in order to work
a reversal.    Fisher, Justice, who wrote the opinion upon the
motion for a rehearing, which evidently the counsel did not
read carefully, said:

"I hold that a majority of the court must, in every case
brought into this court, agree upon error, before reversing a
judgment of the court below.    But when I make this decla-
ration I at the same time say that the error must be something
which could, under proper rules of practice, be assigned as
error."

Thus the court sustained the general rule, but held that it
was applicable only to error in the broad sense that might in-
clude many detail errors, as, for instance, that all grounds for
a new trial required to be raised by a motion for a new trial
and exception saved to the order denying it, constitute but
one ground of error within the rule.    In that case, that an
order denying a motion for a new trial because the verdict is

contrary to the evidence, and because of misconduct of the jury, if erroneous, is single, supported, perhaps, by two reasons, and that a concurrence upon the reasons is not necessary. To that Judge HANDY dissented, holding failure of concurrence upon a single ground of error, in a much more restricted sense, requires affirmance of the judgment. He stated the position thus:

"It thus appears that although two members of the court are of the opinion that the judgment should be reversed, yet they do not agree that there is any error in any specific decision or ruling of the court below; and when the grounds of error assigned were considered by the court below *seriatim,* a majority of the court were, and still are, of the opinion that there is no error in any specific decision or ruling of the court."

He thus stated his conclusion, basing the same on unanswerable logic:

"Although a majority of the court may not agree in the reason which led each of their minds to the conclusion, that any specific rule or point of law has been erroneously decided, yet it is necessary that a majority should concur in the opinion that there is error in one and the same rule or point of law, as held by the court below. Otherwise, if the case goes back for a new trial, and the same point arises, the decision of the court below would, necessarily, be the same as was previously made, because the judge would be bound to know that this court had held that there was no error in that particular decision. . . ."

The learned judge further stated that the natural result of any other rule would render it impossible to finally determine a jury case if the trial judge adhered to his opinion and the judges of the appellate court adhered to their individual views, and further as to the particular case:

"The generality of the assignment does not amalgamate points and questions of law which are in their nature distinct, and which this court must pronounce upon as legal questions in deciding the case. Suppose, on the trial, the court below

had granted the instructions at the instance of the state. The assignment of error here on that ground, under the strict rule which formerly prevailed here upon the subject, would be a general one, that the court erred in granting the instructions for the state. And, in considering that assignment, the first instruction comes up, and two members of the court think that there is no error in it, the third member considering it erroneous. It is then settled that there is no error as to that. The second instruction is then considered, and two members are of opinion that there is no error as to that, one of the majority upon the first instruction thinking that there is error in it. It is then settled that there is no error as to the second instruction. The third is then considered, and determined by a majority of the court to be proper, the member who agreed with the majority upon the two other instructions dissenting upon this. It would be settled that there was no error in the third instruction. It would, therefore, clearly be the judgment of the court that there was no error in any of the instructions. And how is it possible that the general mode of assigning errors could make error in that which was not error in itself, or that several propositions, which in themselves were distinct and separate, and ascertained to be correct and proper, could be rendered erroneous by being considered together?"

Counsel suggest that *Bell v. Morrison,* 27 Miss. 68, which we cited in the former opinion, does not apply. The difficulty with counsel is that they do not understand that case, and perhaps it is not to be wondered at since the report is not full. We think it is safe to take what Justice HANDY said in *Browning v. State,* 33 Miss. 47, of the result in *Bell v. Morrison,* as he wrote the opinion in the latter case. It is evident that the conclusions reached in such case on the motion for rehearing, which the report shows was made, were not written out, and the only evidence we have of them is what Justice HANDY said in the latter case. He there said:

"I consider this motion as settled by the rule held by this court in the case of *Bell v. Morrison,* 27 Miss. 68, where the court was divided in opinion upon two points in the case, but

there not being a majority holding that upon either of the points there was error. The first impression of the court in that case was that the judgment should be reversed, there being a majority of that opinion, as in this case; but upon motion after argument, the decision was that the judgment should be affirmed, which was accordingly done, because there was not a majority of the court holding there was error in any of the points decided by the court below."

Counsel concede that *Cook v. Drew,* 3 Stew. & P. 392, and must also agree that *Bell v. Morrison, supra,* is against them from any point of view, and that the same is true of *Browning v. State, supra,* unless the assignment of error that the finding as to legal capacity to make the will and the one as to undue influence, so far as error is concerned, are single.

Counsel argue that there was but one error, not two, notwithstanding the fact that there were two findings and two specific claims of error, grounded on separate exceptions, made and argued. The following quotation from *Cook v. Drew, supra,* shows that the situation presented was exactly the same as in this case. The court said:

"One member of the court is for reversal on one of the points; another on a different point; and the third thinks there is no error in the record. Hence it results that though a majority believe there is error, this majority cannot concur as to the *point,* or *matter,* for reversal, so as to determine any principle of decision. . . . To authorize a reversal, this concurrence is required in the result, on some material point necessarily involved in the case."

Counsel fail to distinguish between a point vital to a judgment and mere reasons bearing thereon.

Counsel also concede that *Shollenberger v. Brinton,* 52 Pa. St. 10, was governed by the same rule as that which prevailed in *Cook v. Drew, supra,* but avoid the result by suggesting that all of the exceptions to the findings constituted but one ground of error.' If that were correct, in a case involving any number of findings of fact, each vital to the case, and

each specially excepted to as wrong, and one out of seven jus-
tices was of the opinion that some specific finding was con-
trary to the evidence, being opposed by his six brethren, and
the same condition existed as to three other findings, a dif-
ferent justice, however, as to each such finding being for a
reversal, the judgment would have to be reversed. It would
be hardly possible to think of anything more absurd.

Counsel refer to *Pollock v. C. Hennicke Co.* 64 Ark. 180,
46 S. W. 185. True, that is an adverse decision. Its glar-
ing infirmity is plainly pictured by BLACKWOOD, special
judge, in an able dissenting opinion. He said, in substance:
There is no concurrence of a majority of the judges on any
point. There are a majority of minorities in favor of error.
The result of a decision that there is fatal error is this: In
case of another cause, similar in every respect, being submit-
ted below and the court following the majority opinion now
made, it would arrive at a result entirely different from the
decision now given. It would necessarily be contrary to the
majority view of a majority of the judges on the identical
point in this case. He said in concluding, very properly, "It
strikes me as an effort to make one right out of two wrongs.
The result announced by a majority of the learned judges is
arrived at by a species of logic which I am unable to compre-
hend, and therefore unwilling to sanction."

The Arkansas court seems to have been misled by *Ashby
v. White,* 2 Ld. Raym. 938, 950, which, when examined, is
found not to involve any question, whatever, as to the dispo-
sition of a case on appeal from a trial court where a majority
are unable to agree as to the existence of a specific harmful
error. Investigation shows probability that the English case
was not examined by the Arkansas court, but was taken from
the citation in Ram's Legal Judgments, 53, which is also cited
by the Arkansas court. It will be seen, by examination, that
the text-writer was not dealing with the subject under discus-
sion in this case at all, but the subject of the disposition of a

cause tried originally, not on appeal, before a bench of judges. In that case minorities, in reason, unite, if the individuals by different processes of reasoning reach the same result. Failure to appreciate the difference between that situation and the reversal of a case on appeal on errors assigned, is doubtless what led to the decree in *Smith v. U. S.* 5 Pet. 292, 303. So the basis for the decision by the Arkansas court entirely drops out.

Counsel make a further reference to *Ditch v. Sennott,* 116 Ill. 288, 5 N. E. 395, as being squarely in favor of contestants' position. Why that case was cited we are unable to comprehend, because it does not deal with the subject under discussion or have the remotest reference to it. There was no assignment of error whatever in that case and the appeal was dismissed upon that ground, all the justices concurring.

Counsel seem to think that our suggestion that the views of Judge HANDY in *Browning v. State,* 33 Miss. 47, were later referred to in the same court with high commendation, was not warranted, and that the reference, such as was made in the later case, was a doubtful commendation. Perhaps the best solution of that may be made by quoting the language of Judge WHITFIELD, who wrote for the court on the motion for rehearing (*Lipscomb v. State,* 75 Miss. 559, 623, 23 South. 210, 230):

"Judge HANDY's opinion in that case is said to be a very powerful one, and it certainly is, and, in the judgment of the writer, is the sound view."

That was as far as it was permissible to go, as the point was not then vital. One cannot well read Judge WHITFIELD's opinion without concluding that, had such point been vital, the court would have returned to the doctrine which Judge HANDY said ruled *Bell v. Morrison,* and which his brethren disclaimed intending to depart from, but did, as Judge HANDY reasoned, by grouping vital points of error as mere reasons in support of a single assignment.

There is a class of cases such as *Foltz v. Merrill,* 11 Kan.. 479; *Wood v. Chapin,* 13 N. Y. 509; and *Oakley v. Aspinwall,* 1 Duer, 1, holding that where a majority are for affirmance, but on different grounds, the judgment should not be reversed.    They are not out of harmony with *Cook v. Drew, supra,* and similar cases.    Of course a judgment is always to be affirmed unless there is a majority for reversal, and, as we think, agreeing upon a specific ground of error, which could not be possible if a majority were for affirmance, even on different grounds.    The former leads, logically, to the latter.

. We are unable to see any other orderly way to dispose of an appeal in the circumstances of this one, except according to the rule in *Cook v. Drew,* 3 Stew. & P. 392, and like cases.. If the rule contended for were to prevail, a jury case could' never be terminated, if both sides persisted and courts adhered to their views, and the judgment in an equity case would create this anomalous situation: The judgment on its face would be a precedent to sustain either of the several positions taken by the several minorities, though looking at the determination as to each of the subsidiary questions, the precedent would be the other way.    Such confusion should be avoided by adopting the more logical rule, as we have done.

*By the Court.*—The motion for a rehearing is denied, with $25 costs.   ·