STATE, RESPONDENT, *v.* LE DUC, APPELLANT.

(No. 6,808.)

(Submitted April 8, 1931. Decided May 4, 1931. Opinion on Motion for Rehearing Filed June 24, 1931.)

[300 Pac. 919.]

*Mr. A. G. Stone* and *Mr. J. A. Poore,* for Appellant, submitted an original and a supplemental brief; *Mr. Poore* argued the cause orally.

*Mr. L. A. Foot,* Attorney General, and *Mr. T. H. MacDonald,* Assistant Attorney General, for the State, submitted a brief; *Mr. MacDonald* argued the cause orally.

MR. JUSTICE ANGSTMAN delivered the opinion of the court.

Defendant was convicted of murder in the second degree and sentenced to a term of twenty-five years' imprisonment in the state prison. He has appealed from the judgment and from an order denying his motion for a new trial. He admits that he shot and killed the deceased, John F. Snyder, but contends that he did so in self-defense.

1. His first contention is that the evidence was insufficient to justify the verdict. His contention is that the undisputed physical facts demonstrate the falsity of the state's evidence, establish the truthfulness of his own, to the effect that the killing was in self-defense and command a verdict of not guilty as a matter of law.

The shooting occurred at about 5:30 A. M. on March 5, 1930, in room 16 of a rooming-house in the Lisa Block at 401 Colorado Street, in Butte. Death resulted shortly before midnight on March 6. The rooming-house was operated by defendant. Deceased and Clem Ostdiek then; and for nearly a year prior thereto, occupied room 16 as tenants. Defendant gave them notice on March 2 that their tenancy was terminated and that from then on their rent would be $5 per day. Prior to that it was $1 per day. He chose to sever the relationship of landlord and tenant between himself and them by reason of the fact that over the repeated protests of himself

and his wife they were in the habit of creating loud noises at all hours of the night, and frequently took women and young girls to their room.

Between 4:40 and 5:00 o'clock on the morning of March 5, defendant, who occupied a room on the floor below that where room 16 was located, was awakened and looking through the transom of his room saw a man and woman coming down the stairs; the man had a grip in his hand. Defendant went to the door and saw it was Clem Ostdiek and a woman leaving the building. Ostdiek had not paid the rent due and defendant, according to his testimony, made a grab for him and took his hat (according to the testimony of Clem Ostdiek defendant then struck him twice), and defendant went to the telephone in his room and called the police, informing them that Ostdiek had left without paying his rent.

At about 5:30 that morning defendant was again awakened by footsteps going up the stairway, and, as he had previously had experience with prowlers in the building, thought this a repetition of that experience. He put on his slippers and bathrobe, placed his gun, a 380-Colt automatic, in the right-hand pocket of the bathrobe, went into the hallway and up the stairs. He saw no one in the hallway but observed a light in room 16. He testified that the door was slightly ajar, but Bill Jones, a witness for the state, testified that the door was closed. Defendant said he knocked on the door and Snyder, who was then in the room, said, "Come in." Jones said there was no knock on the door. In any event, defendant entered the room and found there Snyder and Bill Jones.

There is a sharp conflict in the evidence as to what transpired thereafter. Jones testified that when defendant entered he said to him, "Get to hell out of here"; that the witness proceeded to get out of the room and in so doing rushed past defendant to the door, and as he got through the door defendant hit him behind the right ear with what the witness thought was a gun. He went to the hospital and remained there for fifteen days. He said he was "out of his senses" for three days. He neither heard nor saw anything that transpired in the room thereafter. Defendant's version of what took

place when he entered the room was that he said, "Ostdick has moved, Snyder," to which Snyder replied, "So, I understand"; that then Jones raised his right hand quickly and that he, the defendant, thereupon struck Jones with his left fist. After Jones left the room the shooting took place with no one present but defendant and the deceased.

The state introduced in evidence three dying declarations of the deceased. In order to more accurately understand the substance of these declarations a brief description of room 16 is desirable.

The room faces the east on Colorado Street. The east side has two windows situated 5 feet 8 inches apart. In the room was a bed extending east and west with the head end to the east between the two windows. There was but one door leading into the room. It was on the west and near the north wall of the room. Against the south wall was a gas stove, kitchen cabinet, bookcase and chiffonier. The gas stove was in the southwest corner of the room. To the east of it was the kitchen cabinet, with 2 feet 2¾ inches between it and the stove. To the east of the cabinet was the bookcase, with 10 inches between it and the cabinet. East of the bookcase was the chiffonier. There were 11 inches between the bookcase and the chiffonier, and the chiffonier was 10 inches from the east wall, and there was a space of about 3 feet between the bed and the chiffonier. To the foot of the bed and against the west wall was a table, the table and bed being 6 feet 9 inches apart. Directly north of room 16 was room 18. According to one of Snyder's statements, when defendant entered the room he pulled out a "sap" and said, "Get out, you sons-of-bitches," and hit Jones over the head with it; that he (Snyder) was standing at the head of the bed and on the south of it, and he said, "I turned around to see what it was all about and he [meaning Le Duc] had the gun out"; that he, Snyder, said, " 'Oh, don't use that,' " and I got this one in the throat then. Wasn't only a fraction of a second's difference." Asked what he did after that, he said, "I reached around in the dresser behind me to get my own gun

and while I turned around he shot me again in the hip." He said he got his gun and as he turned around he slipped and fell on one knee and defendant fired again, hitting him in the left arm. He then said: "I pulled the trigger on mine, and I don't know whether I hit him or not and don't care." In response to the question whether he gave Le Duc any reason to shoot him, he said, "No, I can't say that I did." Defendant, he said, shot the fourth time but it did not hit him; that defendant then ran out of the room. He said he knew Jones was still in the room when the third shot was fired, because "I looked over the end of the bed, thought he was going to shoot him too."

The other dying declarations, made at different times and which are not claimed to have been erroneously admitted in evidence, were, on the material matters, substantially repetitions of the statements already alluded to.

Defendant testified that as Jones left the room, Snyder was standing at the southwest corner of the bed and he near the northwest corner; that Snyder immediately jumped from where he stood to the dresser, grabbed the second drawer from the bottom and pulled it to the floor; that Snyder wheeled around in a crouching position and shot at defendant, filling his eyes with powder; that he, defendant, thereupon took out his gun, moved to the east and started shooting. When he was able to see he saw Snyder at the southwest corner of the bed with his gun pointed at defendant, in the act of shooting. Defendant could see only the top of his shoulder and part of his head and his hand which was over the edge of the bed; that Snyder shot the second time and was jerking his hands in an effort to shoot again. Defendant thought he himself shot four times. He ceased shooting, he said, because Snyder put both of his hands on the floor. When Snyder did this, defendant said he backed out of the room and went downstairs.

It is clear that if defendant's version of the shooting is correct, then he acted in self-defense and should have been acquitted. On the other hand, if the jury was warranted in

accepting Snyder's version of it, then the act of defendant constituted murder beyond the possibility of a doubt.

Ordinarily, when there is such a conflict in the evidence, the solution of the question is for the jury. And this is so even though defendant's story is corroborated by evidence of other witnesses. But defendant, in reliance upon the rule stated in *State* v. *Gunn*, 85 Mont. 553, 281 Pac. 757, contends that the undisputed physical facts demonstrate the falsity of Snyder's statements and attest the accuracy of his own and of those who testified in his behalf, and for that reason the verdict cannot stand.

The physical facts relied upon are these: The bullet which struck Snyder in the throat abrased the point of the chin, entered the oesophagus just above the larynx and was found lodged at the lower portion of the left shoulder-blade. Its course was downward. The only blood found in the room was on the floor at the southwest corner and near the foot of the bed. All four of the bullets shot by defendant were found. One was taken from under the left shoulder-blade of deceased. One was found lodged in his left arm. The one that struck his right hip passed through the hip-bone, struck the vertebrae and ranged downward and passed out through the rectum and was found lying on the floor. The fourth was found lodged in the floor under the bed near the southwest post of the bed. There was evidence that it had passed through the mattress of the bed, struck the bed spring and was deflected from its course and found in the floor. Two bullets shot by defendant passed through the mattress and were shot from the northeast corner of the bed toward the southwest corner; hence, one of the bullets that struck the mattress also struck the deceased. The bullet that was found in the left arm of the deceased, entered his overcoat which he was then wearing, at the point of his right shoulder, passed through the coat in front of his chest without contacting the body, came out of the coat midway between the shoulder and the waist line on the left side, and struck his left arm about an inch and a half above the elbow. A bullet hole was found in the north wall of

the room 8 feet $4\frac{1}{2}$ inches from the floor. It passed through the south wall of room 18, 8 feet $7\frac{1}{2}$ inches from the floor and struck the ceiling in room 18, $29\frac{1}{2}$ inches from the south wall. The bullet was later picked up by the electric carpet sweeper when cleaning the room, and found upon cleaning the sweeper. It was a Luger soft-nosed bullet, while those of defendant were steel-jacketed bullets. An imaginary line from the ceiling in room 18 where the bullet struck, through the partition wall at the point where the bullet pierced it, into and across room 16, would pass over the bed about a foot from the west end of it, indicating that it was shot from the southwest corner of the bed.

Andrew Braun and his son were occupying room 18 at the time of the shooting. They were awakened by a knock at the door before the shooting. The door leading into this room was situated directly beside the door to room 16. They did not know whether the knock was on the door to their room or on the door to room 16. They heard the shots which were fired. The first shot, they said, is the one that entered their room and it scattered plaster over them as they were lying in bed.

When the officer took the Luger gun from Snyder, he was told by Snyder that the gun jammed on him or he would have "bumped Le Duc off." At that time the clip containing the shells was down about a quarter of an inch. When in that condition the gun would jam and could not be used. It is equipped with a button, located to the left of the trigger, designed to accomplish this result by pressing on the button.

Herbert C. Kreichelt, a roomer in the Lisa Block, heard the shots. There was a pause between the first and second shots, and the second and succeeding ones were fired in rapid succession.

The officers who examined the room in defendant's presence, shortly after the shooting, testified that defendant in explaining what happened told them that Snyder fired the first shot and otherwise detailed the events of the shooting as told by him on the witness-stand.

The defendant contends that, if it be assumed that the dying declarations of Snyder were properly admitted in evidence, still the physical facts demonstrate that his statements of the manner in which the shooting was done were false or erroneous for the following reasons:

First. He contends that Snyder's statement that he was shot by defendant in the throat while standing at the head of the bed is shown to be impossible by reason of the fact that the bullet took a downward course. But it should be noted that Snyder did not say that he was standing in an upright position. His statement simply indicates the point in the room where he stood. Had he been leaning forward, though standing on his feet at the time the shot was fired, or had he suddenly stooped forward in an effort to avoid the aim of the defendant, the course of the bullet could have been as it was found to be.

Second. It is contended that if Snyder was shot in the neck while standing at the head of the bed, and if he reached for his gun in the chiffonier as he stated, there would have been blood stains in that vicinity. We think the jury was warranted in assuming that the absence of blood stains in that vicinity was due to the fact that he wore an overcoat at the time, which would in a large measure prevent the blood from escaping on to the floor. That but little blood escaped is apparent from the fact that even though Snyder, after the shooting, left the room at the point where he was shot and went downstairs to the street, there was no other sign of blood in the room except at the southwest post of the bed, and none was found on the bed.

Third. It is contended by defendant that, since one of the bullets that struck the mattress of the bed also struck deceased, it must have been the one that hit him in the hip, rather than in the left arm, for, it is contended, there is no evidence that he ever had his body under the bed sufficient to permit the bullet to enter at the point of the right shoulder after penetrating the mattress. Hence, defendant contends that the conclusion follows that Snyder was not shot in the hip while he was turned toward the chiffonier in an effort to get his

gun. But we think there was sufficient evidence to warrant the jury in concluding that the shot that pierced the mattress was the one that entered the left arm, rather than the hip of deceased. The bullet that entered and lodged in the left arm evidently had spent its force before striking the arm, for, if it had not, it doubtless would have passed through the arm. We think the evidence does not demonstrate conclusively that Snyder's version of the shooting was false or erroneous on this account.

Fourth. It is contended that, since the witness Braun and his son testified that the first shot is the one that entered their room, it must follow that defendant's version of the shooting is correct, Snyder's false. But the jury were at liberty to disbelieve these witnesses and accept Snyder's version of it as given in three dying declarations. Also it should be noted that both Andrew Braun and his son testified that Andrew Braun, Jr., remained in bed and was there when the officers, Nixon. and Sullivan, came to examine the room. Officer Nixon testified that there was no one in the bed when he examined the room. The jury, under the circumstances, was entitled to distrust their testimony if they believed that given by Nixon, and was at liberty to conclude that the first shot was not the one that entered room 18. The fact that the bullet which entered room 18 was shot by Snyder from the southwest corner of the bed is reconcilable with Snyder's story of the shooting. The fact that it went wild from the position where defendant then stood is explainable by the fact (according to Snyder's statements) that he had at that time been shot in three different parts of the body, two of which, according to the evidence, were fatal shots. Under such circumstances it is easily conceivable that he had lost the capacity to choose with accuracy the direction in which to shoot, and particularly when his gun jammed on him, as he stated.

We think the evidence adduced by the state was sufficient to warrant a conviction and that it is not demonstrably false because irreconcilably in conflict with known physical facts, as was the evidence in the *Gunn Case,* supra.

2. The next point urged by defendant is that the dying declaration of Snyder, as related by Mary Hogan, was improperly admitted in evidence for want of proper foundation. This statement was made to Deputy County Attorney Levinski in the presence of Mary Hogan, a stenographer who took the questions and answers in shorthand. It appears that after Levinski had asked a few questions he was called to the telephone and left the room. Mary Hogan then said to Snyder, "You had better rest until Mr. Levinski returns," to which Snyder replied, "I think I will be done by then. Everything is getting pretty dark." In about a minute Levinski returned and the statement was taken. Later on, in the course of his examination, when discussing the fact of his partner, Clem Ostdiek, leaving the Lisa Block, he said, "Well, where he was taking his grips. I am not going to give up and so he—" There was then a pause, said Miss Hogan, and Snyder sort of gasped and closed his eyes and appeared to be in distress. The defendant contends that because of his statement, "I am not going to give up," it is apparent that Snyder was not then under a sense of impending death. We do not so construe his statement. The court was warranted in finding that what Snyder then meant, when his words are taken in connection with his actions and under the circumstances of the case, was that he was not going to give up making the statement respecting the cause of his death. We think, taking into consideration the nature of his wounds, his conduct and his statements, a proper foundation was shown for the introduction of the declarations made by Snyder to Mary Hogan, within the meaning of subdivision 4 of section 10531, as interpreted in the case of *State* v. *Martin*, 76 Mont. 565, 248 Pac. 176, and the cases therein cited, and *State* v. *Vettere*, 76 Mont. 574, 248 Pac. 179.

3. As a part of his dying statement, Snyder was asked, "Did you give Le Duc any reason at all to shoot you?" His answer was, "No, I can't say that I did." It is contended that this was calling for a conclusion made by Snyder to the witness. The witness had already testified to facts

stated by Snyder from which this conclusion (if such it be) would follow as a matter of law, and we think admission of this statement under the circumstances, if erroneous, was harmless. (See *State* v. *Collins,* 88 Mont. 514, 294 Pac. 957.) However, the statement was nothing more than that the shooting was done by defendant without provocation, and such a statement has been held to be one of fact, and not a conclusion. (*State* v. *Crean,* 43 Mont. 47, Ann. Cas. 1912C, 424, 114 Pac. 603; 30 C. J. 275; note in 25 A. L. R. 1395.) It is characterized by some courts as the statement of a collective fact and, as such, is admissible. (See note in 63 A. L. R. 571, and 30 C. J. 275, note 58.)

4. As a part of the dying declaration, over objection of ▋ defendant, the witness Mary Hogan was permitted to show that Snyder stated in substance that Le Duc hit Bill Jones over the head with a "sap." Defendant contends that this was error because it was not a statement "respecting the cause of his death" within the requirement of subdivision 4, section 10531, supra. This section is but declaratory of the common law "and has generally been held to be sufficiently broad to comprise the facts and circumstances of the killing, and such other facts and circumstances, immediately surrounding and attending it, as properly form a part of the *res gestae.*" (*State* v. *Crean,* supra; see, also, 30 C. J. 272.) The statement was properly admitted.

5. Defendant assigns error on the part of the court in ▋ permitting the state, over his objection, to allow the witness Mary Hogan, who referred to her transcribed notes of the dying statement, to read questions propounded to Snyder and his answers, without following the order in which the several questions were asked, and by eliminating some of the questions and answers. We think this was immaterial. There are cases holding that such statements must be admitted in their entirety (*State* v. *Carter,* 107 La. 792, 32 South. 183), at least so far as possible (*State* v. *Perretta,* 93 Conn. 328, 105 Atl. 690). Here it should be noted that the statement was not read to, approved or signed by the deceased. The

most that defendant was entitled to under the circumstances here was to have the whole of the statement introduced, if he so desired and requested on cross-examination. (30 C. J. 271, 272; *State* v. *Vettere,* supra.) Defendant was permitted to introduce such parts of the statement made by Snyder as he desired, which were omitted by the state. His rights were not prejudicially affected by the manner in which the dying declaration was admitted.

6. Clem Ostdiek, a witness for the state, testified that he ██ saw Snyder in the room where the shooting occurred, at about 4:00 A. M. on March 5, and that he again saw him in the Lotus Block at about 5:30 A. M. He identified the clothes that were worn by him at the time as those introduced in evidence. On cross-examination, after showing that the witness related to Snyder the difficulty that he had with defendant, the defendant offered to prove that Snyder said, "I am going over to the room now and we will see if Le Duc can throw me out"; that the witness urged him not to go, as there would be plenty of trouble and that Snyder then said, "Well, I'm going over there now and if Le Duc shows up I'll either be coming back or staying there." The court sustained the objection of the state, stating that it was not proper cross-examination but matter of defense. The objection was properly sustained. The matter sought to be elicited on cross-examination was in no manner connected with the matters stated in the direct examination of the witness. In this respect the case is distinguishable from that of *State* v. *Whitworth,* 47 Mont. 424, 133 Pac. 364, relied upon by defendant.

Defendant also contends that the evidence offered was admissible as a threat by deceased made against the defendant for the purpose of aiding the jury in determining who was the aggressor. Threats made by deceased against the defendant are admissible on this issue. (*State* v. *Inich,* 55 Mont. 1, 173 Pac. 230; *State* v. *Caterni,* 54 Mont. 456, 171 Pac. 284.) But the defendant may not, on the cross-examination of a state's witness, over the state's objection establish his defense when the matter sought to be elicited is in no manner connected

with the statements made by him in his direct examination. (*State* v. *Smith,* 57 Mont. 349, 188 Pac. 644.)

7. On the day of the homicide the defendant made a voluntary statement of the facts concerning the shooting. It was taken in shorthand by Mary Hogan, the county attorney's stenographer. On the cross-examination of defendant for the purpose of laying the foundation for his impeachment, the county attorney was permitted to ask if a certain question had not been propounded to him when he was making his statement, and if he did not give a certain answer thereto. He responded by saying, "I don't think so." Defendant's counsel on redirect examination offered the entire statement made by him, claiming the right to do so by virtue of section 10515, Revised Codes 1921, which in part provides: "When part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by the other." At the time defendant offered the entire statement, there had been as yet no part of the statement actually admitted in evidence. The defendant had simply stated that he did not think he had made such a statement. It is true that Mary Hogan was called in rebuttal and testified that defendant did make such a statement. Defendant, in surrebuttal, or in the cross-examination of Mary Hogan, had he so requested, might have offered such parts of the entire statement as would have a tendency to qualify, explain or contradict that part of the statement testified to by Mary Hogan, but no such request was made. At the time the entire statement was offered it was properly excluded.

8. Over objection of defendant during his cross-examination, he testified: "Q. Did you not in the city jail, shortly after one o'clock, March 5, in the presence of yourself and Ed Cooper, the reporter for the Montana Standard, tell Mr. Cooper in substance that you knew who it was that went up the stairs; didn't you say that to him? A. [Mr. Le Duc] I don't believe I did. Q. Is there any doubt in your mind whether you did or not? A. There is. Q. And you may have told him that? A. I don't believe I did. Q. Did you not

tell Mr. Cooper at that time and place, in substance, that you knew it was Snyder? A. I did not. Q. Who was going up the stairs? A. I did not.''

In rebuttal the witness Cooper, over objection of defendant, was permitted to testify as follows: ''Q. I will ask you if shortly after one o'clock on March 5, 1930, in the city jail, and in the presence of yourself, and Mr. Le Duc, if Mr. Le Duc did not say, or in substance say, that he knew who it was that went up the stairs? A. Yes, he did. Q. To what time did the conversation had by you and Mr. Le Duc, on the 5th day of March, 1930, refer? A. Shortly after one o'clock, I would not say exactly. The court: ''Well, Mr. Rotering, the witness misunderstands you. Q. You had a conversation with Bert Le Duc about who had walked up the stairs in the Lisa Block, did you not? A. Yes sir. Q. Of what were you and Mr. Le Duc speaking at the time? A. We were speaking of the shooting. Q. Was anything said about anyone walking up the stairway before the shooting? A. There was, yes. Q. Did Mr. Le Duc tell you when the party walked up the stairway, whom he said he knew? A. Yes. Q. To what time, if you know, did Le Duc refer when he said the person whom he knew walked up the stairway? A. He said only immediately before the shooting.''

Defendant contends that the foundation for the testimony of Cooper was too indefinite and uncertain to advise the witness to what time the question related. Conceding that the time to which the question related was indefinite, we think that affected the weight to be given to the testimony adduced from Cooper, rather than its admissibility. If it did not in fact impeach the testimony of defendant, as contended by defendant, then it was harmless. The testimony of Cooper was properly introduced and its weight was a question for determination of the jury.

9. Defendant contends that the court erred in instructing the jury on murder in the second degree. Whether or not the element of deliberation is present, distinguishing first from second degree murder, is, save in exceptional cases,

to be determined, not by the court, but by the jury. (*State* v. *Calder*, 23 Mont. 504, 59 Pac. 903; secs. 12022, 11868, Rev. Codes 1921.) Where the slaying was committed in the perpetration or attempt to perpetrate some one of the felonies enumerated in the statute (sec. 10955, Rev. Codes 1921), the court need not give an instruction on second degree, for in such a case the crime is not divisible into degrees. (*State* v. *Baker*, 13 Mont. 160, 32 Pac. 647; *State* v. *Reagin*, 64 Mont. 481, 210 Pac. 86; *State* v. *Bolton*, 65 Mont. 74, 212 Pac. 504; *State* v. *Fisher*, 54 Mont. 211, 169 Pac. 282.)

Generally speaking, the exceptional cases wherein the court need not give an instruction on second degree murder are those where the killing was charged to have been perpetrated by means of poison, lying in wait, or torture, or where it resulted in the commission of some felony enumerated in the statute. (*Bandy* v. *State*, 102 Ohio St. 384, 21 A. L. R. 594, 131 N. E. 499.) But in a proper case the exception extends also to any deliberate and premeditated murder, where there is no evidence tending to show the commission of a lesser offense than murder in the first degree. (*People* v. *Watts*, 198 Cal. 776, 247 Pac. 884, and note in 21 A. L. R. 603 and 622.)

My associates think this was a proper case for an instruction covering second degree murder. Proof of the homicide by defendant having been made by the state, the crime is presumed to be murder in "the second degree." (*State* v. *Chavez*, 85 Mont. 544, 281 Pac. 352; *State* v. *Kuum*, 55 Mont. 436, 178 Pac. 288; *State* v. *Fisher*, 23 Mont. 540, 59 Pac. 919.) The burden was upon the state to introduce evidence satisfying the jury beyond a reasonable doubt that there was deliberation and premeditation in order to raise the crime to murder in the first degree. The jury was at liberty to disregard the evidence of the facts and circumstances tending to show deliberation and premeditation. They were at liberty to believe all, a part, or none of the testimony of any witness. (*State* v. *Fisher*, supra.) As said in the last cited case: "What occurred at the time Allen was killed, and the state of

the defendant's mind, were to be found by the jury from the evidence." My associates are of the view that the court properly instructed the jury on murder in the second degree.

It is my view that the facts in this case bring it within the exceptional cases where it is improper to give an instruction on murder in the second degree. The important facts of the homicide are related by two witnesses. If Snyder's version of the shooting, as given through the dying declarations, was correct, then it is my opinion that the defendant is guilty of murder in the first degree; for "whenever the killing is with a deadly weapon, and there is evidence *aliunde* showing that this was intentionally, deliberately, and unjustifiably used, then the inference is that of an intent to take life, and the case is murder in the first degree." (Wharton's Criminal Law, sec. 518; see, also, *People* v. *Watts*, 198 Cal. 776, 247 Pac. 884; *Dickens* v. *People*, 67 Colo. 409, 186 Pac. 277.) According to Snyder's story, the murder was committed in cold blood. There was no quarrel or mutual combat preceding the shooting. There was no provocation by words or otherwise. It was not unintentional or accidental shooting. The first and fatal shot, according to his story, was fired by defendant. It struck deceased in the neck, the vital spot where it would be certain to produce death. Deliberation, which is the distinguishing feature between murder in the first and second degree, need not be shown expressly by evidence. "It is generally to be inferred from facts and circumstances attending the killing." (*State* v. *Leakey*, 44 Mont. 354, 120 Pac. 234.) The court in that case also said: "Here the killing is shown to have been done under circumstances which, aside from the alleged mental condition of the defendant, leave no room for an inference other than that it was wilful, deliberate murder." To the same effect is *State* v. *Vettere*, 76 Mont. 574, 248 Pac. 179, where the above language from *State* v. *Leakey* was quoted with approval. Here no issue is presented regarding the mental condition of defendant. Accepting Snyder's story of the shooting, I think there can be no doubt that it was murder in the first degree. The district court evidently

thought so, for an instruction on murder in the first degree was given.

Is there any evidence in the case, direct or circumstantial which might be said to show, or permit of an inference, that the shooting was unjustifiable and yet without deliberation? I think not. Defendant admits that he did the shooting. To all intents and purposes he admits that it was done intentionally. He raises no issue on the question of deliberation. Virtually he admits that he did the shooting deliberately, but insists that he did so to save his own life. He concedes that there was no combat or quarrel before the shooting and that there was no provocation except that the deceased, without any cause, fired the first shot. If his version of the shooting is correct he is entitled to an acquittal. It seems to me that under the evidence presented here, the only question for determination of the jury was whether deceased or defendant fired the first shot. If the deceased did, an acquittal should have followed; if the latter, then it was murder in the first degree. I fail to find any evidence in the case justifying a middle ground. I realize that the jury may disbelieve all or any part of the evidence of any witness, but that does not solve the problem here. When we reject all of the evidence from Snyder, there is no other evidence, direct or circumstantial, on which to base a verdict other than one of acquittal. If we reject all of the defendant's evidence and accept Snyder's version, then there is no evidence left upon which to base a verdict other than one of first degree murder. And when we reject the evidence of both eye-witnesses or attempt to reject a part of the evidence produced from each of them, we must indulge in speculation and surmise as to how the shooting occurred. Verdicts based upon surmise and conjecture cannot stand. (*State* v. *Hood, ante,* p. 432, 298 Pac. 354, and cases therein cited.)

Moreover, if the jury may disregard the evidence showing deliberation, then I see no reason why they may not also disregard the state's evidence tending to raise the degree of the crime of murder to first degree when it was committed

in the perpetration of a felony. Yet this court has repeatedly held that in such cases an instruction on second degree need not be given. (*State* v. *Bolton*, 65 Mont. 74, 212 Pac. 504; *State* v. *Reagin*, supra; *State* v. *Fisher*, supra; *State* v. *Baker*, 13 Mont. 160, 32 Pac. 647; see, also, *State* v. *Calder*, 23 Mont. 504, 59 Pac. 903.)

It should be noted that the physical facts and circumstances do not justify an inference that the shooting occurred differently than the sworn evidence shows. It does not point to a crime midway between first degree murder and acquittal. The only claim here made, or that could be made, in regard to the physical facts is that they bear upon the question as to which one of the eye-witnesses told the truth.

The rule which I think is applicable here is stated by the author of the exhaustive note in 21 A. L. R. 622, as follows: "If there is evidence or an unsworn statement which, if believed, warrants an acquittal, a defendant convicted of the lower degree of homicide may base a claim of reversible error on an instruction, submitting a lower degree of homicide, followed by a conviction of the lower degree, where no evidence warrants the instruction." (See, also, *People* v. *Schleiman*, 197 N. Y. 383, 18 Ann. Cas. 588, 27 L. R. A. (n. s.) 1075, 90 N. E. 950; *State* v *Hunt*, 30 N. M. 273, 231 Pac. 703, and *State* v. *Pruett*, 27 N. M. 576, 21 A. L. R. 579, 203 Pac. 840.)

The reason for the rule is well stated in the case of *Bandy* v. *State*, 102 Ohio St. 384, 21 A. L. R. 594, 131 N. E. 499, as follows: "Where there is no evidence from which a reasonable inference can be drawn for any other degree than murder in the first degree, it is not only not error for the court to refuse to charge upon such lesser degree, but would be error for the court to so charge; for obviously, if the defendant in such case is not guilty of murder in the first degree, his liberty should not be dickered away by a compromised verdict upon another degree which is supported by no evidence." This court has made like comment upon the rule in *State* v. *McGowan*, 36 Mont. 422, 93 Pac. 552.

It is my opinion that the presumption of second degree murder arising from the fact of the killing by defendant, if it has application at all in a case where, as here, defendant admits the killing and justifies in self-defense, is a rule affecting the burden of proof only and the presumption cannot take the place of substantive evidence and be used as the foundation for a verdict which the jurors were sworn under section 9348, Revised Codes 1921, to render according to the evidence.

But if it be assumed that the presumption of second degree murder may in a proper case be the basis for a verdict, it is still one that fades away in the face of contrary facts. (See *Welch* v. *All Persons*, 85 Mont. 114, 278 Pac. 110; *Nichols* v. *New York Life Ins. Co.*, 88 Mont. 132, 292 Pac. 253.) Here the evidence adduced by the state, if believed, raises the crime to first degree. The defendant's evidence, if believed, entitles him to an acquittal. Also the presumption of innocence that should attend the defendant throughout the trial ought to be sufficient to overcome the presumption of second degree murder in a case where, as here, the defendant admits the killing and seeks to justify it on the ground of self-defense where it is undisputed that there was no quarrel or combat preceding the shooting.

I am not able to find any evidence in the case upon which to base a verdict other than murder in the first degree or acquittal. It is my opinion that the court erred to the prejudice of defendant in giving, over his objection, an instruction on second degree murder.

10. Complaint is made that the court erred in instructing the jury, in effect, that deliberation and premeditation may be formed in an instant. Since the defendant was convicted of second degree murder only, it follows that the jury must have concluded that there was no deliberation, and hence he was not prejudiced by the court's instruction even though it be assumed that it was erroneous.

11. Defendant offered two instructions designed to permit the jury to pass upon the question whether the declarations of Snyder were made *in articulo mortis:* The offered

instructions were refused and the jury was limited by the instructions of the court, so far as their consideration of the dying declarations was concerned, to weigh their truth or falsity, and the accuracy or inaccuracy of their recital by the witnesses. The cases are in conflict as to whether it is error to remove from the jury's consideration the question of whether the declarant was under a sense of impending death at the time the declarations were made by him. (1 R. C. L. 536; 13 Cal. Jur. 730; 30 C. J. 268, 269, and note in 8 Ann. Cas. 539.) The question has been foreclosed in this state in the case of *State* v. *Vettere,* supra, wherein like offered instructions were held properly refused. This conclusion is in harmony with the views of Mr. Wigmore, that distinguished author on Evidence, who said: "After a dying declaration, or any other evidence, has been admitted, the *weight* to be given to it is a matter exclusively for the jury. They may believe it or may not believe it; but, so far as they do or do not, their judgment is not controlled by rules of law. Therefore, though they themselves do not suppose the declarant to have been conscious of death, they may still believe the statement; conversely, though they do suppose him to have thus been conscious, they may still not believe the statement to be true. In other words, their canons of ultimate belief are not necessarily the same as the preliminary legal conditions of admissibility, whose purpose is an entirely different one (*ante,* sec. 29). It is therefore erroneous for the judge, after once admitting the declaration, to instruct the jury that they *must* reject the declaration, or exclude it from consideration, if the legal requirement as to consciousness of death does not in their opinion exist. No doubt they *may* reject it, on this ground or any other; but they are not to be expected to follow a definition of law intended only for the judge. Nevertheless, this heresy has obtained sanction in some jurisdictions, it is analogous to that already discussed in reference to a jury's use of confessions (*ante,* sec. 861)." (3 Wigmore on Evidence, 2d ed., sec. 1451.)

12. Defendant assigns error in the refusal of the court to ▉▉▉▉ give his offered instruction No. 17A, reading as follows: "You are instructed that the declarations of a dying person are to be considered with great caution, and you should give such declarations such weight as under all the evidence you believe they are entitled to receive. You should consider that such declarations cannot be subjected to the test of cross-examination like other testimony. If you believe from all of the evidence that the declaration is false in any material part, you may reject the entire statement."

It is true that dying declarations are to be admitted with great caution (*State* v. *Martin*, supra), but that is an admonition addressed to the court in ruling upon the admissibility of an alleged dying statement—a question, as we have held, with which the jury has no concern. The jury being the sole judges of the weight to be given to the testimony, it is not error to refuse to give an instruction that a dying declaration should be viewed with great caution. (*State* v. *Gay*, 18 Mont. 51, 44 Pac. 411.) The fact that such declarations cannot be subjected to the test of cross-examination like other testimony was specifically pointed out in another instruction given. The last part of the offered instruction was erroneous, in that if part of the declaration was found to be false it only justified an instruction to the jury that they may distrust, not reject, other parts. (Subd. 3, sec. 10672, Rev. Codes 1921.) A general instruction in the language of this statute was given. The offered instruction was properly refused.

The court is confronted with the situation where three of the Justices, constituting the majority, think error was committed requiring a new trial. But those three are not in accord on any one ground for reversal. The majority of the court sustain the action of the district court upon every question presented on the appeal.

While there is some conflict among the authorities as to the proper course to pursue under such circumstances, we think the correct rule was announced by the supreme court

of Wisconsin in the case of *In re McNaughton's Will,* 138 Wis. 179, 118 N. W. 997, where it is said: "A situation so extraordinary rarely occurs in judicial work. That it should move judicial minds to exhaust all reasonable efforts for harmony, as it has in this case, is most natural. The situation, while peculiar in a high degree, is nevertheless not new, as the following citations will show: *Legal Tender Cases,* 52 Pa. 9–101; *Browning* v. *State,* 33 Miss. 47–87, 88; *Cook* v. *Drew,* 3 Stew. & P. (Ala.) 392; *Bell* v. *Morrison,* 27 Miss. 68. The rule adopted in the most pronounced of these cases and highly commended as sound in *Lipscomb* v. *State,* 75 Miss. 559, 624, 23 South. 210, 230, seems to be the only logical one, though one case found in the books, *Smith* v. *United States,* 5 Pet. (U. S.) 292, 303, 8 L. Ed. 130, proclaims a different doctrine, but without assigning any reason therefor or its having been subsequently followed by the federal court, so far as we can discover. The view which we adopt is that a majority must agree on some one specific ground of error fatal to the judgment or it must be affirmed. Otherwise there would be a reversal without any guide for the trial court upon a new hearing. Unless the trial judge changed his mind, the result would be the same as before and a like result as formerly would happen on a second appeal, and as said by Handy, J., in his opinion in *Browning* v. *State,* supra, and highly commended, as before indicated, in *Lipscomb* v. *State,* supra, 'such would be the strange and anomalous attitude of the case, *ad infinitum,* as often as it should be tried below and brought here on the same state of facts.' "

Accordingly the judgment is affirmed.

ASSOCIATE JUSTICES FORD and MATTHEWS concur.

MR. CHIEF JUSTICE CALLAWAY, Dissenting: I agree with the majority opinion except as to divisions 2 and 5, but do not agree with Mr. Justice Angstman's view that the court should not have instructed the jury with respect to murder in the second degree.

It is my belief that Snyder fired the first shot but the jury did not take that view; and, as I read the record, there is substantial testimony, even without the first "dying declaration," to sustain the verdict, and such being the case it is not within my province to interfere on that score.

It is altogether probable that the jury's verdict rests upon the first declaration. Such of it as went to the jury is in the exact words of the defendant, while the two later ones are based upon the recollections of Kelly and Daley. The first declaration goes into much greater detail on material points than do the two later ones. The first declaration, therefore, is all-important. With due deferenec to the opinion of my associates who compose the majority in this case, I think the first declaration should not have been admitted, and, further, that there was error in the method followed in admitting so much of it as was received at the instance of the state.

1. A dying declaration is hearsay, and hearsay fraught with danger, involving, as it does, the liberty, and often the life, of one accused of felonious homicide. While it has been said that the reception of a dying declaration violates all rules of evidence (*State* v. *Carter*, 107 La. 792, 32 South. 183), it is admitted because of necessity, from motives of public policy, and without it the slayer might go unpunished. It must be received with great caution (*State* v. *Martin*, 76 Mont. 565, 248 Pac. 176), and the rules governing its admissibility must be followed carefully. When we consider the dramatic setting of a dying declaration, which sometimes carries the evidence far beyond its merits, we appreciate the more the strictness which hedges about its admission.

Our statute, section 10531, subdivision 4, Revised Codes 1921, provides: "In criminal actions, the act or declaration of a dying person, made under a sense of impending death respecting the cause of his death" is admissible.

In *State* v. *Martin*, supra, Mr. Justice Holloway, in a well-considered opinion, quoted the following from *Rex* v. *Woodcock*, 1 Leach C. C. 500: "Now the general principle on which this species of evidence is admitted is that they are declara-

tions made in extremity, when the party is at the point of death, and when every hope of this world is gone; when every motive to falsehood is silenced, and the mind is induced by the most powerful considerations to speak the truth; a situation so solemn, and so awful, is considered by the law as creating an obligation equal to that which is imposed by a positive oath administered in a court of justice.'' And also the following from 3 Wigmore on Evidence, second edition, section 1440: ''It follows, from the general principle, that the belief must be, not merely of the possibility of death, nor even of the probability, but of its *certainty*. A less stringent rule might with safety have been adopted; but this is the accepted one. The tests have been variously phrased: there must be no 'hope of recovery'; 'a settled expectation of death'; 'and undoubted belief.' Their general effect is the same. The essential idea is that the belief should be a positive and absolute one, not limited by doubts or reserves; so that no room is left for the operation of worldly motives.''

In the *Martin Case* we declared: ''It will be observed that the rule requires, as a condition precedent to the admissibility of the declaration, preliminary proof of the concurrence of the following conditions: (1) That the declaration was made *by a dying person,* or in the more flowery phrases of the courts, by one *in extremis* or *in articulo mortis;* (2) that the declaration was made under a sense of impending death; (3) that the declaration relates to the cause of the declarant's death, or, more exactly, to the cause of his dying condition.''

While it may be conceded that Snyder was in a dying condition at the time the declaration was made, no preliminary showing was made that he knew it, or that he made the declaration under a sense of impending death. Upon this vital point there was no showing whatever unless it can be said that the response he made to Miss Hogan's admonition, referred to hereafter, supplied it.

When the state began its proof looking to the admission of the alleged dying declaration, counsel for the defendant asked the court to excuse the jury in order to ascertain whether the

declaration was entitled to admission in evidence. The court denied the request. Had it been granted, in accordance with the suggestions made in *State* v. *Kacar,* 74 Mont. 269, 240 Pac. 365, and *State* v. *Vettere,* 76 Mont. 574, 248 Pac. 179, wherein that procedure is approved, much of the resulting confusion would not have occurred, and probably the error would have been avoided. This is made plain when the conditions under which the declaration was made are understood. It was made at St. James Hospital, in Butte, at 10:30 in the morning, about five hours after Snyder was shot. About Snyder's bed were Levinski, the deputy county attorney, a newswriter, and Miss Hogan, a stenographer of sixteen years' experience, then employed in the county attorney's office. The questions were asked by Levinski and answered by Snyder. They were taken down accurately by Miss Hogan and transcribed correctly by her.

This is the way this so-called dying declaration was put before the court: Miss Hogan having taken the stand, said she was a stenographer in the county attorney's office, that she had seen Snyder at the hospital, had taken the testimony, and so forth. She said: "Mr. Levinski questioned Mr. Snyder concerning his wounds, and he made answers," and then, over objections fully challenging the procedure being followed and the absence of a preliminary showing, which were overruled, the prosecuting officer, omitting all questions and answers prior to the time Levinski left the room, elicited the statement Snyder made to Miss Hogan, and was permitted to select from the transcript such questions and answers as he desired. The testimony of Snyder, even if admissible, did not go to the jury in consecutive form. This is illustrated by a part of Miss Hogan's cross-examination, in which she was asked if she did not read a portion of the testimony and then turn back a page or two and read, to which she said, "Yes sir." "Q. They were not read in the order in which the answers were made by Mr. Snyder? A. Well, I don't quite understand your question. Q. Well, for instance, you turned over several pages and answered certain questions, and then you turned

back several pages afterwards and answered certain questions?
A. Yes sir.''

Here is what took place at the hospital: At the beginning of the statement, after Snyder had given his name and his place of residence, Mr. Levinski said: (1) ''Q. Mr. Snyder, on account of the nature of your wounds that you have, it is a very serious question whether or not you may pull through, you understand that? A. Yes sir. (2) And in view of the fact that death may be impending, I would like to have you make a statement as to how you happened to come to have these injuries, these wounds, and who inflicted them, if you would give that to us. A. Well, I will say what I can. Q. Do you know who shot you? A. Yes. Q. Who was it? A. Bert Le Duc. Q. Was it the same Bert Le Duc, a former deputy sheriff? A. Yes sir. Q. What time was it that you were shot? A. Oh, I guess it was about six o'clock. Q. Do you know where you were at that time? A. Yes sir. Q. Where? A. I was at the Lisa Block where I room. Q. What was your room number in the Lisa Block? A. 16. Q. How did Le Duc come to shoot you? A. Well, he bawled my partner out. Q. Who was your partner? A. Clement Ostediek. Q. Was he rooming with you? A. Yes sir. Q. You say Le Duc had bawled your partner out? A. Listen, the story goes like this. My partner went up early this evening and another fellow happened to go up with him, and Le Duc did not like this other fellow, told him to stay away a couple of times, and so he bawled my partner out, told him to move, and my partner packed up his stuff and took them over to a friend's on Main Street. [At this point Mr. Levinski called to the telephone.] By Miss Hogan: You had better rest until Mr. Levinski returns. By Mr. Snyder: I think I will be done by then; everything is getting pretty dark.''

It is upon Snyder's reply to Miss Hogan's admonition that the admissibility of the declaration depends. Upon this isolated statement, over the strenuous objections of counsel for defendant, the court admitted the portions of the declaration. The court did not then have before it the preliminary ques-

tions which appear in the statement, notably those I have marked (1) and (2), nor a statement made almost immediately after Levinski returned, in which Snyder said: "I am not going to give up * * * ." What did Snyder mean when he said, "I think I will be done by then; everything is getting pretty dark?" Did he mean that he would be unable to continue the statement, and so be done with it, or did he mean that he was about to die? The state, of course, contends for the latter interpretation. If that interpretation were adopted it would not be conclusive necessarily. (30 C. J. 265, 266.) This followed quickly after questions (1) and (2) and there is no suggestion of despair in the answers to those. Snyder was in a weakened condition. ' When he replied to Miss Hogan, did he think he was about to pass into unconsciousness? He did not become unconscious. When Levinski returned, after a moment's absence, he said to Snyder, "All right, go ahead," and Snyder responded: "He told me to get out," and continued his testimony. Almost immediately he said, "I am not going to give up," and so forth. Here the state contends that he meant he was not going to give up making his statement, and the majority of the court agrees. I refrain from comment.

After the two slight interruptions about the time Snyder said he was not going to give up, he continued to give his answers in a clear and logical manner. After the statement to Miss Hogan there was not an intimation that he was testifying under a sense of impending death. What was his mental state when he made that reply? Who knows? Be it remembered that neither the court nor jury occupied an advantage over ourselves in judging upon this. Miss Hogan was testifying from a written instrument, a copy of which we have in the record in its entirety, although the jury did not have it. When the declaration is read in its entirety, and not in fragments, in my opinion, it clearly does not come within the undoubted rule laid down in *State* v. *Martin,* supra, where we said: "There is but one rule of evidence which measures the *quantum* of proof in a criminal case." The burden was on

the state to prove beyond a reasonable doubt that Snyder made his declaration under a sense of his impending death. I say the state did not successfully bear that burden. Had the question of the admissibility of the declaration been submitted to the court as it should have been, I doubt if the court would have admitted it.

In their eagerness to convict, prosecuting officers should remember that it is their duty to do justice to the person on trial as well as to the state.

2. The surrounding circumstances shown do not affect the point in question here one way or another, but there is another strong reason to doubt that the first declaration was a dying declaration. It shows Snyder in a revengeful mood, not at all forgetful of worldly affairs. In that respect it differs to a remarkable degree from the declarations made by him to the witness Daley the next day and particularly at night when death was rapidly approaching. I do not believe that at the time of his first declaration Snyder thought death was near, or that it would be the inevitable result of his wounds. He thought it probable, no doubt, but that is not enough.

3. Proceeding now upon the assumption that the declaration should have been admitted. It was, in a measure, made under official sanction. All questions and answers were written down. The answers were dictated by the deceased. The official stenographer was in a position to give Snyder's exact words. "Where such declarations are taken down in writing, at the time they are uttered, although not signed by the deceased, being more reliable and accurate than the memory of most men, they should be produced and read at the trial." (*People* v. *Callaghan*, 4 Utah, 49, 6 Pac. 49; and see *Scales* v. *State*, 96 Ala. 69, 11 South. 121.)

We must not fall into error by failing to distinguish between a memorandum prepared by someone other than the declarant, not signed by him, and a statement actually dictated by the declarant, whether signed by him or not. The declaration made by Snyder, containing his actual words, and being the best evidence of what he said, if admissible, should

have been presented to the jury as he gave it (subject, of course, to the duty of the court to exclude incompetent parts thereof), in order that the jury might have the declaration in consecutive order with due regard to the correlation of its parts. In no other way can it reflect, even approximately, that essential factor—the state of Snyder's mind when he gave it. Surely authority is not called for upon principles of justice so elementary.

But it is said that the state having offered a part of the declaration, the defendant was at liberty to offer the rest. That this is fallacious is obvious when we remember that defendant contended at all times that the declaration was wholly inadmissible for the want of a proper foundation. No such situation was presented in *State* v. *Vettere,* supra.

Convinced that the admission of the first declaration in evidence was error, which was emphasized by the manner in which parts of it were presented to the jury, I think the defendant should be granted a new trial.

MR. JUSTICE GALEN, Dissenting: I dissent. As to the admissibility of the dying declaration, testified to by the witness Mary Hogan, by her taken in shorthand and therefrom transcribed into writing, I agree with the views expressed by the Chief Justice in his dissenting opinion. It was not properly admitted as a dying declaration under the settled law reviewed by the Chief Justice relative to the prerequisites of such a statement in order to make it admissible, and its admission was highly prejudicial to the defendant. In fact, were it eliminated from the record, it is very doubtful whether the jury would have found the defendant guilty. At any rate, the conviction is supported entirely by Snyder's dying declarations, and Miss Hogan's testimony, not properly admitted, must have greatly influenced the jury in its verdict. Not only that, but the physical facts discredit the alleged dying declaration as to which she was permitted to testify, and it is noteworthy that the facts stated in the majority opinion are taken entirely from Miss Hogan's testimony.

The case was tried by the state upon the theory that the defendant fired the first shot, and deliberately murdered Snyder; while the defense proceeded on the theory that Snyder fired the first shot and that the defendant acted solely in self-defense. Therefore, the physical facts are most important to be considered in view of the fact that the defendant's conviction stands solely upon the statements of Snyder, admitted as his dying declaration. Even though the statements made by Snyder, testified to by Miss Hogan over defendant's objections, were properly admissible, they are completely discredited by the physical facts and the testimony of witnesses in corroboration thereof in no manner impeached or overcome by other evidence. Snyder said that he was standing at the head of the bed at the southeast corner thereof, at the time of the shooting, but this cannot be true as shown by the physical facts. The defendant fired four shots and Snyder fired two. Four shells from Le Duc's gun were found and placed in evidence, and also four bullets which came from his gun. Three of the bullets fired by the defendant entered Snyder's body. All four of the bullets fired by the defendant were found and identified. One was taken from the left shoulder-blade; one was lodged in the left arm; the one that struck Snyder in the right hip passed through the hip-bone, struck the vertebrae, ranged downward and passed out the rectum. It was found lying on the floor. The fourth was found lodged in the floor under the bed near the southwest corner post of the bed. There was evidence that it had passed through the mattress on the bed, struck a bed-spring, was deflected from its course, and was found on the floor. Two bullets shot by the defendant passed through the mattress and were, by reason of the course indicated, shot from the northeast corner of the bed toward the southwest corner; hence, one of the bullets that struck the mattress also struck Snyder. Therefore, the most easterly of the two bullets which passed through the mattress must have been one of the bullets which hit Snyder. By taking the holes made in the mattress in the line in which they appear to have been shot from Le Duc's

gun, it is unmistakably demonstrated that he was standing on the north side of the bed, and fired in a southwesterly direction towards the foot of the bed where the blood spots were found on the floor. The bullet which struck Snyder in the throat abrased the point of the chin and was found lodged in the lower portion of the left shoulder-blade. Its course was downward. One of Snyder's bullets passed through the north wall of room 16, which was occupied by him, and entered room 18, adjoining, where it was found; the other passed through the edge of the door in the west wall of room 16, but was not found. As two of the bullets fired by Le Duc passed through the mattress on the bed, one of them must have entered Snyder's body. Le Duc says that Snyder fired the first shot while stooping by or shielded by the bed at the southwest corner thereof, while he (Le Duc) stood over at the northeast corner of the bed when Snyder shot at him. His testimony in this respect is corroborated by reason of a bullet hole through the north wall of the room and into room No. 18 adjoining, made by Snyder's gun at a point 8 feet and 4½ inches from the floor, 6 feet 1¾ inches from the east wall of the building, fronting on Colorado Street, and 15 feet from the west wall, near the entrance to the room. The ball entered room 18 through the partition 8 feet 7½ inches from the floor and struck the ceiling thereof 29½ inches north from the south wall of room 18. An imaginary line extended from the ceiling in room 18 where the bullet struck and through the partition wall at the point where it was pierced by the bullet, into and across room 16, would make the bullet pass over the bed about a foot from the southwest corner of it, thus demonstrating beyond doubt that the shot was fired by Snyder, as the defendant testified, from a position near the southwest corner of the bed from a point near the floor, where the blood spots were found.

In addition to these convincing physical facts, substantiating the defendant's story of the homicide, Andrew Brann, who occupied room 18 adjoining, testified that he was working as a pressman at the "Butte Daily Post"; that he is thirty-

nine years of age, a widower and has a boy thirteen years of age, who occupied room 18 in the Lisa Block with him; that he heard a knock on the door which awakened him; he did not know whether it was on his door or the next door, room 16; he heard voices in room 16, and then a shot was fired. When the shot was fired a bullet came through the wall into the room he occupied with his son, hit the ceiling and spattered plaster all over him and the boy as they lay in bed. He heard five or six shots after that. About two or three seconds elapsed between the first and second shots. The first shot fired was the one which entered his room. His son, Andrew Brann, Jr., testified to the same effect. Coupled with the physical facts, this testimony completely discredits Snyder's statements, and fully sustains the defendant's account of the tragedy.

In my opinion, the physical facts here shown are equally as persuasive, if not more so, than those appearing in the case of *State* v. *Gunn,* 85 Mont. 553, 281 Pac. 757, where the rule announced applicable in civil actions in the case of *Casey* v. *Northern Pacific Ry. Co.,* 60 Mont. 56, 198 Pac. 141, was given approval in criminal cases, viz.: "We are not unmindful of the advantageous position occupied by the jury and the lower court in having the witnesses before them, in hearing them testify, and observing their demeanor; but, though the appearance of a witness is an aid in judging his credibility, it is not an infallible one. Dissimulation is often difficult to detect, and falsehood is often clothed in the garb of truth. Whenever the surrounding circumstances make the story of a witness highly improbable or incredible, or whenever the testimony is inherently impossible, a new trial should be ordered. Physical conditions may point so unerringly to the truth as to leave no room for a contrary conclusion based on reason or common sense, and under such circumstances the physical facts are not affected by sworn testimony which in mere words conflicts with them. (*Groth* v. *Thomann,* 110 Wis. 488, 86 N. W. 178.)"

It is my opinion that the rights of the defendant at the trial were greatly prejudiced by the testimony of the witness Mary Hogan, improperly admitted, and that the physical facts are such that the verdict and judgment should not be permitted to stand.

## ON MOTION FOR REHEARING.

(Decided June 24, 1931.)

MR. CHIEF JUSTICE CALLAWAY delivered the opinion of the court.

Upon this motion the court is called upon to consider the correctness of the judgment announced in the opinion promulgated May 4 of this year.

The situation presented being a legal tangle we invited and were favored with oral arguments by respective counsel.

Counsel for appellant insists that the court has overlooked his assignment of error No. 21, that the court erred in refusing to grant appellant a new trial, and that we failed to give consideration to constitutional and statutory provisions, among which are: "A majority of the supreme court shall be necessary to form a quorum or pronounce a decision." (Const., Art. VIII, sec. 5.) "In the determination of causes, all decisions of the supreme court must be in writing, and the grounds of the decision must be stated." (Sec. 8801, Rev. Codes 1921.) "After hearing the appeal, the court must give judgment without regard to technical errors or defects, or to exceptions, which do not affect the substantial rights of the parties." (Sec. 12125, Rev. Codes 1921.) "The court may reverse, affirm, or modify the judgment or order appealed from, and may set aside, affirm, or modify any or all of the proceedings subsequent to, or dependent upon, such judgment or order, and may, if proper, order a new trial. In either case the cause must be remanded to the district court with proper instruction, together with the opinion of the court." (Sec. 12127, Rev. Codes 1921.)

In the opinion of the majority it is said: "The court is confronted with the situation where three of the Justices, constituting the majority, think error was committed requiring a new trial. But these three are not in accord on any one ground of reversal. The majority of the court sustains the action of the district court upon every question presented on the appeal," pursuant to which the judgment was affirmed. This conclusion of the court is the main basis of the motion for rehearing.

Upon consultation it is disclosed that each of the Justices retains the same opinion which he had when the opinion was handed down, except as to the correctness of the conclusion, viz.: that even if three of the Justices believe the trial court committed errors requiring a new trial, because they do not agree upon the precise ground for reversal, the judgment must be affirmed.

Mr. Justice Ford and Mr. Justice Angstman believe that the majority opinion is sound in all respects and that the conclusion therein announced should not be disturbed. Mr. Justice Galen, Mr. Justice Matthews and the writer think the conclusion is wrong and the case must be reversed.

The real question, disregarding legal phraseology, is, did the defendant have a fair trial? Three of the Justices have declared that he did not. "The law of the land guarantees to every man a fair trial," as this court said in *State* v. *Shafer*, 22 Mont. 17, 55 Pac. 526.

Section 12048, Revised Codes 1921, declares that "when a verdict has been rendered against the defendant, the court may, upon his application grant a new trial in the following cases only," which are set forth under seven subdivisions. The fifth is "when the court has misdirected the jury in a matter of law, or has erred in the decision of any question of law arising during the course of the trial."

Mr. Justice Angstman says the court misdirected the jury in a matter of law to the defendant's prejudice. Mr. Justice Galen and the writer say the court erred in the decision of questions of law arising during the course of the trial. Mr.

Justice Galen also says the evidence does not support the verdict. Such being the fact, a majority of the court is of the opinion that the trial court should have granted a new trial. It does not matter that we three are not in accord as to the particular error; each is of the opinion that an error was committed under subdivision 5 of section 12048. Thus a majority of the court is of the solemn conviction that the defendant did not have a fair trial. This being so, because we do not agree as to the particular error or errors assigned— the assignment of error being a mere procedural requirement— must the defendant, whose right to a fair trial was disregarded, serve twenty-five years in the state prison? The opinion as written answers this in the affirmative in reliance upon the *McNaughton Will Case* (138 Wis. 179, 118 N. W. 997).

Upon further consideration of that case, and the authorities which it cites, and others which have come to the court's attention since the opinion in this case was written, we conclude that the weight of authority is against that case and it should not be followed. We think it is hypertechnical, with a tendency to subvert justice. The only case which sustains it is *Cook* v. *Drew*, 3 Stew. & P. 392 (Ala. 1833). It is argued that the *Legal Tender Cases*, 52 Pa. 9, uphold it but this is doubtful to say the least. At any rate, what is said in the *Legal Tender Cases* on the point is pure *obiter dictum*, and the supposititious illustrations do not fit the case at bar. *Bell* v. *Morrison*, 27 Miss. 68, does not touch upon the question at all. The majority opinion in *Browning* v. *State*, 33 Miss. 47, is directly to the contrary. Mr. Justice Fisher, in delivering the majority opinion, said: "Both points, the want of evidence and the misconduct of the jury, tend to establish the same proposition, to-wit: a wrong verdict. The object was to show a wrong verdict. Two members of the court have agreed as to this point that the verdict was wrong and that the court below erred in permitting it to stand. Why, then, have not the majority agreed upon the error in the judgment? The Chief Justice says the verdict was clearly wrong and that

the court below erred in not setting it aside. I say the same thing—wrong verdict and error of the court in sustaining it, but base my opinion upon a different ground from that taken by the Chief Justice. * * * It is not necessary that our process of reasoning should be the same, or that we should each attach the same importance to the same points involved; it is sufficient if we agree upon error or substantial matter, to-wit: was the verdict manifestly wrong * * * ?"

The dissenting opinion of Justice Handy in *Browning* v. *State*, and what was said by Mr. Justice Whitfield in *Lipscomb* v. *State*, 75 Miss. 559, 624, 23 South. 210, 230, are the main bases of the opinion in the *McNaughton Case*; but the fact is that the court in *Lipscomb* v. *State* follows the majority opinion in *Browning* v. *State*, and the rule "highly commended as sound" in *Lipscomb* v. *State*, as is said in the *McNaughton Case*, appears to be merely the opinion of Mr. Justice Whitfield. It is noted that in *Aetna Ins. Co.* v. *Robertson*, 131 Miss. 343, 95 South. 137, the supreme court of Mississippi again followed the majority rule in *Browning* v. *State:* "The rule that must govern was first clearly announced by this court in *Browning* v. *State*, 33 Mis. 47." (And see *Gulf, M. & N. R. Co.* v. *Dossett*, 118 Miss. 327, 79 South. 179; *Florida etc. Ry. Co.* v. *Hayes*, 65 Fla. 1, 60 South. 792; *Price* v. *State*, 114 Ark. 398, 170 S. W. 235.)

In *Pollock* v. *C. Hennicke Co.*, 64 Ark. 180, 46 S. W. 185, the court said: "Suppose that the two judges who were of the opinion that the judgments were valid had not come to such conclusion, but had agreed with the other judges that the judgments were void as to creditors, basing their opinion on the belief that these judgments were rendered upon fictitious debts; in that event, while the judges would be unanimously of the opinion that the judgments were void, yet, as they could not agree in the reasons for such opinion, it would still be argued that as, on each of the points considered separately, a majority of the judges were for upholding the judgments, therefore such judgments must be held valid,

and the decree of the chancellor reversed. But such reasoning would lead to the absurd conclusion that, if a majority of the judges could not agree upon the reasons for holding these judgments void, then the judgments must be sustained, although the judges were unanimous in the conclusion that they were void. The statement of such a proposition is, we think, sufficient to demonstrate its unsoundness."

In *Smith* v. *United States*, 5 Pet. (U. S.) 292, 8 L. Ed. 130, the court said: "Although on each of the principal objections relied on as showing error in the proceeding of the district court a majority of the members of this court think there is no error, yet the judgment of the district court must be reversed as on the question of reversal the minorities unite to constitute a majority of the court."

As is declared in *Philbrook* v. *Newman*, 148 Cal. 172, 82 Pac. 772, the decision in a case is distinct from the grounds of the decision.

It is urged that, as the trial judge has been sustained upon each of the questions upon which three members of the court severally think he committed error, upon a new trial he may pursue the same course with the same result, and that upon reversing the case this court will not be enabled to give the trial court "proper instruction" as to its conduct on a new trial, and the case may come here again under similar conditions. That is a possibility. But we cannot very well condemn a man to the state's prison for twenty-five years because we fear that possibility. If he has not had a fair trial he is entitled to one. What action this court shall take and what directions it shall give a lower court are beyond legislative control. (*State ex rel. La France C. Co.* v. *District Court*, 40 Mont. 206, 105 Pac. 721.)

The judgment is reversed and the cause remanded to the district court of Silver Bow county, with directions to grant the defendant a new trial.

Mr. Justice Galen concurs.

MR. JUSTICE ANGSTMAN, Dissenting: As stated in the majority opinion, on motion for rehearing, I do not subscribe to the views therein stated on the point considered. Let it be assumed that the real question is, did the defendant have a fair trial?

It must be conceded that if the record presents no reversible error, then the defendant did have a fair trial. If he did not have a fair trial it must be because of error. The province of this court is to consider assignments of error. If prejudicial error appears the judgment must be reversed. If not, it must be affirmed. The fallacy of the majority opinion on rehearing is in assuming that it is the function of this court to take a vote on the question whether defendant had a fair trial or whether he should be granted a new trial as a distinct issue separate and apart from other considerations. A new trial is not warranted unless error is found. That this is so is made clear by our statute. So far as applicable here, the command of the statute is that the court may grant a new trial in the following cases *only:* "When the court has misdirected the jury in a matter of law, or has erred in the decision of any question of law arising during the course of the trial." (Subd. 5, sec. 12048, Rev. Codes 1921.) Obviously, unless one of these grounds is established here—none others being involved—a new trial is not warranted.

It is my view that the court erred to the prejudice of defendant in instructing the jury on murder in the second degree. But the other four Justices say that the court properly instructed the jury on that point. Hence, the judgment of this court is that the jury was properly instructed. Chief Justice Callaway and Mr. Justice Galen are of the view that the court erred in the decision of questions of law arising during the course of the trial. But the other three Justices say there was no error in this respect. Hence, a majority of the court is of the view that neither one of the conditions specified in subdivision 5, section 12048, as ground for a new trial, exists here. The majority which is necessary to pronounce a decision (Const., Art. VIII, sec. 5) has held that no error was

committed by the trial court. This being so, how can it be said that the defendant did not have a fair trial, or on what logical basis is he entitled to a new trial?

In principle, I see no difference between the question as presented here and a case involving the constitutionality of a statute on, let us say, three distinct grounds. Let us assume that one Justice thinks it violates a certain section of the Constitution. Another Justice thinks it violates another section, and a third Justice thinks it conflicts with still another section. Four of the Justices determine that the statute is not in conflict with any constitutional provision. Yet, if the majority opinion here is sound, then the statute must be condemned because a majority of the Justices of the court, each relying on a separate section of the Constitution, think it is bad. Such a conclusion would be unwarranted and indefensible, whether it involved property rights or the rights of one accused of crime. As a legal question I see no difference between the two classes of cases. The fact that defendant was given a severe sentence is no cause for granting a new trial unless error was committed from which that sentence followed.

The majority opinion lays much stress upon the fact that the opinion of the Wisconsin supreme court in the case of *In re McNaughton's Will,* 138 Wis. 179, 118 N. W. 997, followed a dissenting opinion in the Mississippi case and apparently attaches but little importance to the reasoning upon which it is based. The question was given careful consideration by the supreme court of Wisconsin, not alone in its first opinion, but again on rehearing (*In re McNaughton's Will,* 138 Wis. 179, 120 N. W. 288), where the authorities were thoroughly canvassed. The conclusion was adhered to in the later cases of *Grogan* v. *Wisconsin Sugar Co.,* 156 Wis. 406, 146 N. W. 491, and *Harland* v. *Wisconsin Sugar Co.,* 156 Wis. 407, 146 N. W. 492. In my opinion, the soundness of the decisions of the Wisconsin court is beyond question.

I agree with the views, also, of Mr. Justice Ethridge, concurred in by Mr. Justice Cook, in the dissenting opinion in

the case of *Aetna Ins. Co.* v. *Robertson*, 131 Miss.. 343, 506, 94 South. 7, where it was said: "If the entering of the judgment may be assigned for error and every separate and distinct reason which could be urged against the legality of the judgment can be voted separately by each judge for the purpose of procuring a reversal, it may easily follow that a trial judge would be reversed even though on every single specific proposition relied on for error five judges might agree that he was right and only one judge agree that he was wrong. Suppose there were six instructions assigned for error, each of which, if well taken, would reverse the judgment. On No. 1 I would vote to reverse, we will say, and the other five judges vote to affirm. On No. 2 Judge Cook would vote to reverse and the other five judges to affirm. On No. 3 Judge Sykes would vote to reverse and the other five judges vote to affirm. On No. 4 Judge Anderson would vote to reverse and the other five judges vote to affirm. On No. 5 Judge Holden would vote to reverse and the other five judges vote to affirm. On No. 6 Judge Smith would vote to reverse and the other five judges vote to affirm. And on a general vote as to whether the judgment should be reversed, all should vote unanimously for reversal—we would have the anomalous situation of a chancellor being reversed though five out of six judges agreed he was right on every single proposition put up to him. With due deference that is not the action of the court, but is the act of each judge placing himself without the pale of the law and voting arbitrarily his views, enforcing a reversal on the basis of adding minorities when the majority of the court thinks the judgment ought to be affirmed on each specific proposition. * * * If a minority can unite and by sheer personal force enter a judgment not sanctioned by the law previously declared, what certainty can there be in courts or legal proceedings. A judge may rightfully challenge any decision of the court which he thinks unsound in the conference room and urge his fellows to join with him in overruling it, but unless it is overruled it ought to be binding upon him and ought to control his vote.

To refuse to vote in accordance with the law as previously announced by the court, when the court will not overrule its decision, is nothing more nor less than the judge placing himself in rebellion against the law. Judges are selected for the purpose of enforcing and declaring the law as it exists, with the right, whenever the court as a court decides that a decision is wrong and mischievous, to overrule it and declare that to be the law which a majority of the judges decide is the law, but they have no right to disregard the law. A judge of this court is one of the highest judicial officers of the state, at the head of one of the great departments of the state, and above all men ought to conform to and obey the law. * * * I cannot conceive of how we can properly travel under the rule that minorities may unite and control the majorities, or that the judges of this court can refuse to follow the law announced in its decisions when they are unable to overrule them.''

The soundness of the Wisconsin cases and the fallacy of those taking the opposite view is emphasized by the turn that this case has taken. Mr. Justice Matthews thinks there was no error committed by the trial court in any respect. At first thought it might seem that he has as much right to stand for a reversal as the writer has to favor an affirmance, the writer being of opinion that error was committed. But upon analysis, it seems to me this assumption is erroneous. I favor affirmance of the judgment, since this court has determined that the court properly instructed the jury, and since every assignment of error has been held by the majority of the Justices to be without merit. I feel bound to yield to the judgment of the majority of the court in so far as it establishes the legal questions at issue, reserving to myself the right only, which I have exercised, of disagreeing and stating my views on the subject. Reason and authority justify my course.

But what legal principle has been established by the dissenting opinions of Justices Callaway, Galen and myself that induces Mr. Justice Matthews to vote for a reversal of the

judgment and for granting a new trial? So far as I am aware, the most that any court has ever done on the point here considered is to hold that a uniting of minorities constitutes a majority. I know of no case where any Justice who thinks no error was committed has seen fit to insist upon a reversal of a judgment because three others, constituting a majority, think error was committed but where there was no concurrence upon any single ground for reversal. As this case now stands, it presents this situation: The dissenting opinions of Justices Callaway and Galen are obviously not ground for reversal, standing alone. Hence, if the cause is reversed it must be done for the additional reason that the writer of this opinion dissents from the view entertained by the other Justices, that an instruction on second degree murder was proper. Mr. Justice Matthews, though convinced that there was no error in the record, feels compelled to insist upon a reversal simply because the writer of this opinion thinks error was committed in instructing the jury on second degree murder, coupled with the dissenting opinion on other grounds by Justices Callaway and Galen. In the last analysis his final vote for reversal is based upon my state of mind regarding the propriety of giving an instruction on second degree murder, he himself not agreeing with me on that point. This is the only case that I know of where dissenting opinions have been held to affect the action of a Justice who does not agree with them and thus to control the result of the decision of the court. I think the majority opinion on rehearing attaches too much importance to dissenting opinions. On this feature of the case this case stands without precedent.

In the cases cited in the majority opinion it was a combination of the minorities, each clinging to his separate view, that was held to constitute the majority. In none of the cases cited do we find one where a Justice, who was of the view that the record presented no error, casts the deciding vote for a reversal simply because of the force of dissenting opinions. Also, it should be noted that in some of the cases cited the

majority were in accord upon the single ground for reversal but assigned a different reason therefor. Such is not this case.

The conclusion of the majority leads to the absurdity of remanding a case for a new trial where the court has sustained the action of the trial court on every question presented. Upon a retrial the trial court will be justified, if not required, to proceed exactly as before. If the defendant be again convicted of murder in the second degree it must again be remanded for a further repetition of the same proceedings. It seems to me it is not sufficient in disposition of this strikingly strange procedure to suggest that if defendant has not had a fair trial he is entitled to one, where, as here, a majority of the Justices say that there is no merit in any of the several points urged in support of the claim that he has not had a fair trial, and where the court has approved as a standard of fair trial that which he has already had.

I think the conclusion announced on this point in the original opinion promulgated May 4 is correct and should stand.

MR. JUSTICE FORD: I concur in the view of Mr. Justice Angstman.

MR. JUSTICE MATTHEWS: With respect to my position on which comment is made in the dissenting opinion, I have, at all times, conceded that error was committed in admitting the first dying declaration in the manner in which it was admitted, but felt that the defendant's substantial rights were not thereby affected and, therefore, the judgment should not be reversed. (Sec. 12125, Rev. Codes 1921.) I have not receded from that position but I feel that this court is placed in an indefensible position by first admitting that a majority of its members are convinced that the defendant did not have a fair trial and are agreed that a new trial should have been granted under subdivision 5 of section 12048, and then refusing to reverse the order denying a new trial because those

members cannot unite on the reason why a new trial should have been granted.

The writer of the original opinion is firmly convinced that the court erred in instructing the jury on second degree murder and contended that such instruction gave the jury the opportunity to compromise on a verdict when the defendant was entitled to a verdict of acquittal unless the jury believed him guilty of murder in the first degree, yet joined the minority holding contrary to his express conviction in order to form a majority for the affirmance of the judgment condemning the defendant to serve a twenty-five year sentence. He justifies his action by reliance upon the rule announced in a civil action which, at most, affects property rights.

After a careful consideration of the question presented on the motion for a rehearing I am firmly convinced that, whether or not such a rule is based on sound reason in an applicable case, it should not be applied in a criminal case wherein the defendant's liability to punishment must appear beyond a reasonable doubt, and a majority of this court are more than in doubt as to whether or not his constitutional right to a fair trial has been denied.

I believe that each of the majority members should have applied the rule that "a wrong reason for a decision does not invalidate it" (*Ebaugh* v. *Burns,* 65 Mont. 15, 210 Pac. 892) to the decision of the other and thus become the actual majority without yielding the honest conviction of any one of them to a mere rule of procedure. As the writer of the original opinion cannot bring himself to do so, I concur in the conclusion expressed by the Chief Justice in order to prevent the establishment of what I consider a monstrous precedent.